**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**William UNDERWOOD, Paul Messino, Christopher B. Messino, Christopher Richard Messino, and Clement Messino, Defendants–Appellants.**

Nos. 95–2155, 95–2925, 95–2926, 95–3052 and 95–3124.

United States Court of Appeals, Seventh Circuit.

Argued May 28, 1997.

Decided Aug. 7, 1997.

Barry Rand Elden, Chief of Appeals, Matthew M. Schneider, Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, Daniel S. Goodman (argued), U.S. Department of Justice, Criminal Division, Appellate Section, Washington, DC, for Plaintiff–Appellee.

Donna Hickstein–Foley (argued), Chicago, IL, for Defendant–Appellant William Underwood.

Joseph R. Lopez (argued), Chicago, IL, for Defendant–Appellant Paul Messino.

Gerardo S. Gutierrez (argued), Chicago, IL, for Defendant–Appellant Christopher B. Messino.

Marc W. Martin (argued), Chicago, IL, for Defendant–Appellant Christopher Richard Messino.

E.E. Edwards, III, Edwards & Simmons, Nashville, TN, Douglas P. Roller (argued), Roller & Associates, Chicago, IL, for Defendant–Appellant Clement A. Messino.

Before CUDAHY, ESCHBACH, and FLAUM, Circuit Judges.

ESCHBACH, Circuit Judge.

Because the process of empaneling a jury is largely ungoverned by uniform procedural rules, yet fraught with opportunity for constitutional violation, the trial court is well-advised to exercise particular caution during the process. In this case, an unintentionally misleading description of the court's method of jury selection, which the court chose not to remedy after the confusion surfaced, compels us to reverse the convictions of four of the five appellants. The fifth appellant, William Underwood, pled guilty and thus only challenges his sentence, which we affirm.

## I. Background

On November 18, 1993, a grand jury returned a thirteen-count superseding indictment against twelve defendants, including the five appellants who now bring this appeal: William Underwood, Paul Messino

("Paul"), Christopher B. Messino ("Chris"), Christopher Richard Messino ("Dick"), and Clement Messino ("Clement"). The core allegation in the indictment charged all twelve defendants with conspiracy to distribute and possess with intent to distribute multi-kilogram quantities of cocaine. *See* 21 U.S.C. §§ 841(a)(1) & 846. The object of the conspiracy, which allegedly spanned the eleven-year period from 1980–1991, was to purchase cocaine in Florida, and transport it to Illinois for distribution in the Chicago area. Dick and Clement, brothers and former officers of the Chicago Police Department, were the alleged leaders of the conspiracy, and were assisted by Dick's sons Chris and Paul, among others. In addition to the shared conspiracy charge, the appellants here were also separately indicted for the following: Chris and Paul for distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1); Clement and Dick for willfully making false declarations about income to the Internal Revenue Service, in violation of 26 U.S.C. § 7206(1); Clement for money laundering in connection with his June 1991 purchase of property in Monee, Illinois, in violation of 18 U.S.C. § 1956; and Dick for obstruction of justice for attempting to influence a witness's grand jury testimony, in violation of 18 U.S.C. § 1503. The indictment also contained numerous criminal forfeiture allegations relating to real and personal property of appellants, on the grounds that these properties were used in the commission of crime, were proceeds of crime, or were derived from proceeds of crime.[1]

After ruling on an exhausting thirteen-month round of pretrial motions, the district court proceeded with jury selection (an issue to which we will shortly return), and began trial on February 13, 1995. At the trial's end on April 27, 1995, Chris, Clement, Dick, and Paul (collectively "the Messinos") were convicted on all counts and received sentences

ranging from 235 months to life imprisonment.[2] On appeal, the Messinos bring a legion of claims challenging both their jury convictions and sentences. Underwood, who did not participate in the jury trial because he chose to plead guilty, received a 121-month term of imprisonment, which he now appeals.

## II. Discussion

### A. The Messinos

The issues brought before us on appeal chronicle the difficult decisions that the district court faced at trial. For example, the evidence we reviewed revealed close questions on whether the government met its burden to prove a single conspiracy instead of multiple conspiracies and on the appropriate statute of limitations to apply to criminal forfeiture actions. In addition, we note that *United States v. Gaudin*, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), a case decided after the Messino trial, casts doubt on the district court's decision to decide the "materiality" of a false statement made on Dick's tax return as a matter of law, instead of submitting it to the jury. *See United States v. DiDomenico*, 78 F.3d 294, 302–303 (7th Cir.1996); *United States v. Uchimura*, 107 F.3d 1321 (9th Cir.1997); *United States v. DiRico*, 78 F.3d 732 (1st Cir.1996). *But see United States v. Klausner*, 80 F.3d 55 (2d Cir.1996). We need not further discuss these interesting issues, however, in light of our decision to reverse all convictions stemming from the jury trial due to an impairment of the defendants' rights to peremptory challenges during the jury selection process. We therefore limit our discussion to the facts and legal analysis necessary to our decision on the jury selection issue.

▮ The Messinos argue that they were unable to intelligently exercise their peremp-

---

**1.** The allegedly forfeitable properties included seven residential and business properties in Illinois and Florida, fifteen automobiles (including passenger cars, collectible cars, and race cars), three Harley Davidson motorcycles, two speed boats, and over $4,000,000 in cash.

**2.** The charges against the non-appellant defendants, recited in *United States v. Messino*, 852

F.Supp. 652 (N.D.Ill.1994), were disposed of as follows: the charges against Lawrence Thomas were dismissed; Michael Homerding, Thomas Hauck, and Daniel C. Shoemaker pled guilty and were sentenced; and Blaise Messino, Donald Southern, and Gray Chrystall were acquitted at trial.

tory challenges because they were operating under a reasonable misapprehension about the judge's jury selection procedure. In his prefatory description of the process, the judge told counsel that of the potential jurors who survived for-cause and peremptory challenges, the "first twelve" left would constitute the petit jury and the next six would be the alternates. Based on the language used by the judge in his description, and on the visual impact of the selection process itself, defendants thought that the "first twelve" meant the first twelve jurors as they were seated in the jury box. In fact, the judge meant the first twelve names as they appeared on a jury list that only he and his clerk possessed, which did not correspond to the order of seating in the jury box. Defendants maintain that the effect of this misunderstanding, which the judge easily could have remedied after it was brought to his attention, was to impair the intelligent exercise of their peremptory challenges.

■ The Federal Rules of Criminal Procedure give no guidance as to the manner in which peremptory challenges should be exercised in a criminal trial, leaving this and most other jury selection procedures to the discretion of the trial judge. *See United States v. Harris*, 542 F.2d 1283, 1295 (7th Cir.1976). That discretion, however, is not without limits. Abuse of discretion could result, for example, from the "violation of settled principles of criminal law, federal statutes, or constitutional rights of [a] defendant." *United States v. Mackey*, 345 F.2d 499, 502 (7th Cir.1965). The right to exercise peremptory challenges is " 'one of the most important of the rights secured to the accused.' " *Swain v. Alabama*, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965) (quoting *Pointer v. United States*, 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894)). When the jury selection method used by the court arbitrarily denies or impairs the use of that right, resulting in a due process violation, abuse of discretion is clear. Because peremptory challenges are statutorily granted, not constitutionally guaranteed, "the 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive

that which [statutory] law provides." *Ross v. Oklahoma*, 487 U.S. 81, 89, 108 S.Ct. 2273, 2279, 101 L.Ed.2d 80 (1988). Our inquiry today, therefore, is whether the defendants were able to intelligently exercise the peremptory challenges to which they were entitled under Federal Rule of Criminal Procedure 24, the statute that authorizes the use of peremptories in a federal criminal trial.

■ After a careful review of the record, we are convinced that the jury selection process here violated the defendants' Fifth Amendment due process rights by impairing the intelligent exercise of the peremptory challenges to which they were entitled under Rule 24. Accordingly, we must reverse the Messinos' convictions irrespective of prejudice. *Swain*, 380 U.S. at 219, 85 S.Ct. at 835 ("The denial or impairment of the right [to peremptory challenge] is reversible error without a showing of prejudice."); *see also Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1369 (7th Cir.1990) ("[I]ssues of entitlement to a particular kind of tribunal are in general not subject to the harmless error rule.... It is reversible error to deny a party to a jury trial the peremptory challenges to which the rules of procedure entitle him."). The government argues that automatic reversal is unnecessary because the Supreme Court's decision in *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), authorizes the use of harmless error analysis in this circumstance. We disagree. Although not all restrictions on the right to peremptory challenge constitute the denial or impairment of the right, *see, e.g., Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), *Ross* does not authorize us to abandon the automatic reversal rule that the Supreme Court announced in *Swain* where, as here, a denial or impairment of a defendant's statutory right to the intelligent exercise of peremptory challenges is found. We therefore join our sister circuits that have held, post-*Ross*, that harmless error analysis is inappropriate where a defendant's statutory right to peremptory challenge has been denied or impaired.[3] *See United States v. Taylor*, 92

---

3. We share Judge Flaum's concern (as expressed in his concurrence) about "a broad rule of auto-

F.3d 1313, 1325 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 771, 136 L.Ed.2d 717 (1997), and *cert. denied sub nom. Richards v. United States,* —— U.S. ——, 117 S.Ct. 771, 136 L.Ed.2d 717 (1997), and *cert. denied sub nom. Nelson v. United States,* —— U.S. ——, 117 S.Ct. 772, 136 L.Ed.2d 717 (1997); *United States v. Annigoni,* 96 F.3d 1132, 1147 (9th Cir.1996) (*en banc*); *Kirk v. Raymark Indus., Inc.,* 61 F.3d 147, 162 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1015, 134 L.Ed.2d 95 (1996); *Knox v. Collins,* 928 F.2d 657, 661 (5th Cir.1991).

On the day of jury selection in the Messino trial, the district judge met with counsel in chambers to discuss the method of jury empaneling. Using a version of the "struck jury" system,[4] the judge would call a panel of 38 jurors who would be examined and challenged for cause by both sides. Excused jurors would be replaced on the panel, and examination and for-cause challenging of the replacements would continue until the entire panel of 38 was qualified. Counsel for the government and defendants would then separately submit their lists of peremptory challenges to the judge in chambers.[5] From the remaining names, the judge would determine who would be a juror and who would be an alternate. In response to a question by defense counsel, the judge explained how he would make that determination:

> THE COURT: We will put [38 jurors] in the box in the first two rows. Then the first 18 that are left [after for-cause and peremptory challenges] will be the jury, the fist [sic] 12 being the jury, of course, and the next 6 being the alternates.[6]

Trial Tr. Vol. 1A, at 10–11 (Feb. 13, 1995). Because the government and defense might not exercise all of their peremptory challenges, the court explained that some of the 38 potential jurors on the panel might be "left over"—*i.e.,* neither jurors nor alternates. In that case, he explained, "So [the jury] will be on my Clerk's list as she calls them. It will be the first 18. The first 12 will be the jury, and the next 6 will be the alternates, in the manner in which they are called." *Id.* After this discussion in chambers, everyone returned to the courtroom to begin jury selection.

From the venire, the judge's clerk called out the names of 38 potential jurors. The judge instructed them to fill the jury box and the first two pews next to the jury box in the order in which they were called. Thus, the first juror called sat in the first seat in the first row of the jury box, the second juror called sat in the second seat in the first row

---

matic reversal, applicable whenever a defendant has suffered an infringement of his right to exercise peremptory challenges." Since the cases refer to the "denial or impairment" of such a right, we believe the answer to this perplexing question may be found, at least in part, in narrowly defining "denial or impairment."

4. Although the lack of uniform rules leads to local variation, courts typically use one of two basic methods to accommodate the use of peremptory challenges: the "struck jury" system or the "jury box" system. Under the struck jury system, for-cause challenges are made first, until a sufficiently large panel of qualified jurors remains to fill the juror and alternate juror positions should all peremptory challenges be exercised against different jurors. This method allows counsel to see everyone who could potentially be on the jury and select the comparatively most objectionable ones to strike. Under the "jury box" method, however, the parties exercise both their for-cause and peremptory challenges one juror at a time during voir dire questioning, without the benefit of knowing who the replacement juror will be. For a fuller discussion and comparison of these two methods, see *United States v. Blouin,* 666 F.2d 796 (2d Cir.

1981); 2 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 21.3 at 735 (1984).

5. In a non-capital felony trial, the Federal Rules of Criminal Procedure entitle the defendant (or defendants jointly) to exercise ten peremptory challenges and the government to exercise six. Fed.R.Crim.P. 24(b). Where, as here, the court calls for six jurors to sit as alternate jurors, each side is entitled to an additional three peremptory challenges. Fed.R.Crim.P. 24(c). Although the Rules thus entitled defendants to thirteen challenges and the government to nine, they received twelve and eight respectively. Defendants do not appeal the number of peremptory challenges they were allowed.

6. Initially the judge called for a pool of 34 jurors, but increased the number to 38 following his decision to empanel 6 alternate jurors. The increase was necessary to ensure that enough potential jurors would remain to fill the 18 juror and alternate juror positions should all 20 peremptory strikes be exercised against different potential jurors.

of the jury box, and so on, until the jury box and the first two courtroom pews were filled. Members of the venire whose names were not initially called were seated separately in the courtroom, in no particular order, to create a reserve from which new jurors could be drawn to replace jurors excused for cause during voir dire.

The court then began voir dire. Upon excusing a juror for cause, the judge called the name of a reserve venireperson to replace the excused juror, and instructed the replacement to take the excused juror's vacated seat. For example, when the juror in the second seat in the jury box was excused for cause, the replacement juror took the second seat, as opposed to sitting at the end of the first 38 seated jurors. Once the replacement juror was seated, the judge would resume his questioning with that juror. Questioning and replacement continued down the rows in this fashion until all 38 seats were filled with potential jurors that the court found acceptable. At the end of voir dire, prosecution and defense counsel met in the judge's chambers to exercise their peremptory challenges against the 38 qualified jurors. After reciting and striking the names of the potential jurors challenged by each side, the judge began reading the names of the petit jury members. When the

court named Pamela Boucher as juror nine, defense counsel erupted with comments indicating their confusion about the judge's method of ordering jurors and alternates:

MR. LOEB (Donald Southern's counsel): We have got her [Boucher] as an alternate according to the way they are sitting now.

THE COURT: No, it is according to this list.

\* \* \* \* \* \*

MR. ROLLER (Clement's counsel): Judge, defense counsel operated under an erroneous assumption as to the manner or the order in which the prospective jurors would be impaneled on the jury. It was our impression that they would be impaneled on the jury by the way that they were called, even as substituted. In other words, the way they were sitting, beginning and going back to the second row [of the jury box] and then into the gallery. That is the basis upon which we made our strikes, Judge.[7]

Trial Tr. Vol 1A, at 207–08 (Feb. 13, 1995). It was at this point that defense counsel became aware that the judge was ordering the potential jurors according to a list they did not possess, instead of in the order in which they were seated.[8] The judge's list

---

7. In a multi-defendant trial, Federal Rule of Criminal Procedure 24 allows the defendants to either divide the total number of allowed strikes evenly among defendants or exercise the strikes jointly. The record reflects that defense counsel jointly exercised their twelve peremptory strikes.

8. Other defense counsel immediately joined in to express their surprise and dismay that the judge ordered the members of the jury and alternates according to the judge's list, instead of according to the order in which they were seated and questioned:

MS. EPSTEIN (Gray Chrystall's counsel): Now there are people at the very, very end that we were reserving strike, on the jury, where we were making the assumption that they would be the last alternate.

\* \* \* \* \* \*

MR. LOEB (Donald Southern's counsel): Just a minute, our quibble now is not just which individuals remain among the 18, but it is who are the 12 that are sitting before the alternates. The significance to us, and we didn't even discuss it, we all presumed it independently.

MR. GEVIRTZ (Blaise Messino's counsel): We assumed that when somebody went into that chair, No. 2, he became No. 2.

\* \* \* \* \* \*

MR. MARTIN (Dick's counsel): We would have exercised our challenges differently Judge.

THE COURT: I told you, this is the list, that it was going to be, the first 12 were going to the jury that was left on this list. These six were going to the alternates.

MR. LOEB: We interpreted that as the first 12 as they sat in the jury box.

MR. GEVIRTZ: When you didn't move them up and fill in as they were coming in, I assumed when they sat and filled in, they became that number in that spot.

\* \* \* \* \* \*

THE COURT: I thought I told you, that it was going to be done according to the list, eliminating all of the strikes, as they would appear on the jury sheet.

MS. EPSTEIN: We didn't have [the jury sheet]. All we had was the way they were sitting. We were not given the jury sheet. All we had was, we could see where they were sitting and in what order they were being

began with the names of the 38 potential jurors originally called and seated. When the judge excused one of the 38 for cause, the judge's clerk would call the name of a reserve juror as a replacement. Instead of crossing out the name of the excused juror and filling in the replacement juror's name on his list, the judge put the replacement juror's name at the end of his jury list. For example, when the judge excused the second juror called, the first of the 38 jurors he excused, the judge called the name of a replacement juror and asked the replacement to take the vacated seat (the second seat in the jury box). However, instead of putting the replacement juror's name second on his list, which would have been consistent with where he seated the replacement juror, he put the name 39th on his list, after the names of the first 38 jurors called. According to the defendant's (mis)understanding of the judge's method, this replacement juror would have been number 2 on the judge's list. Because so many potential jurors were excused for cause, there was a large discrepancy between the first twelve names on the judge's list, and the first twelve names defense counsel *thought* would be on that list. Relying on their erroneous belief about the judge's list, defense counsel opted not to challenge two particular potential jurors on the belief that they were too far down the list to make it onto the petit jury and if anything, would be mere alternates. These two jurors, however, were among the first twelve on the judge's list, and sat as jurors at trial.

Upon becoming aware of the confusion, the judge would have been wise to exercise an ounce of prevention to avoid what has turned out to be a troubling pound of cure. Instead, the judge responded to the numerous and vehement objections by apologizing for the confusion, but refusing to "do it over." Defense counsel suggested that the court need not reselect the entire jury, but could instead call the jurors in the order in which they were seated in the box and were questioned. We see another alternative: the judge could have distributed his list to both parties and repeated only the peremptory challenge phase, a process which would have put the prosecution and defense on equal footing with a relatively minor affront to judicial efficiency. Nevertheless, the court refused to remedy the problem.

Based on this turn of events, we believe that the defendants' rights to the intelligent use of their peremptory strikes were impaired. The judge's prefatory description of his method of jury ordering did not comport with the method he actually used. The specific language the judge used, that he would "put 34 in the box . . . the [first] 12 being the jury," was reasonably interpreted by defense counsel to mean that the judge would order the potential jurors according to the manner in which they were seated: the jurors in the first twelve occupied seats in the jury box after challenges would be the petit jury, the next six would be the alternates, and any remaining potential jurors would be excused. The reasonableness of this interpretation was bolstered by the visual impact of the order in which the jurors were seated and questioned during voir dire.[9] In order to be consistent with his actual method of ordering the jury,

questioned. Therefore, we assumed—for instance, somebody like Suleman was questioned the very last, would be the last alternate, if he didn't [receive a peremptory challenge].

MR. GUTIERREZ (Chris's counsel): Judge, our biggest complaint is that particularly Pamela Boucher. We had reserved her for a challenge, should she had been in the position that she would have ordinarily taken. Now, your Honor, because she effectively moved up in the list, then we wouldn't mind her being a member of the alternates. But certainly if we had known that she was moving up, as a musical chair instead of a replacement chair.

\* \* \* \* \* \*

MR. MARTIN: Judge, ever[y] single defense lawyer here, we discussed that, and that is each one of our impression, and we discussed that. We would have exercised the challenges differently, if anybody had known. We don't have that list, your Honor has. We were going by the way you were replacing them.

Trial Tr. Vol. 1A, at 208–211 (Feb. 13, 1995).

9. During voir dire, the court did not call replacement jurors by number, or otherwise refer to the potential jurors in a way which might have alerted defense counsel to the discrepancy. Thus, we find unreasonable neither defense counsel's certainty in its interpretation of the court's method nor its attendant failure to ask for clarification.

the judge could have seated replacement jurors at the end of the original 38 jurors called, instead of placing them in the excused jurors' vacated seats. The misleading description by the court, on which the defendants relied, failed to provide the adequate notice necessary for the defendants to intelligently exercise their peremptory challenges. That the court did not intend to mislead the parties is of no import. Regardless of the intention, impairment was the result.

Although the government claims to have understood the judge's ordering method, it does not claim that the court's prefatory remarks were clear, or that the defendants' interpretation of those remarks was unreasonable. Instead, the government contends that reversal is improper because any defense counsel misunderstanding was not the result of any error by the court, and that in any event, the defendants' rights were not "denied or impaired" because they in fact exercised the full number of challenges which they were allowed. These arguments do not persuade. Our decision today does not turn on a belief that the judge's method of jury selection was itself improper. In fact, either method—the one described by the court or the one actually used by the court—would be a proper method of ordering the jurors, as long as all parties were given objectively adequate notice that this method would be used. *United States v. Turner*, 558 F.2d 535, 537–38 (9th Cir.1977) (finding impairment of right to peremptory challenge, necessitating reversal, where "misunderstandings between the court and counsel about the district court's own ground rules" denied defendant adequate notice of the jury selection method used by the court). Without this notice, even if a defendant exercises the full quantity of peremptory challenges to which he is statutorily entitled, his ability to exercise them intelligently may be significantly impaired. In *United States v. Ricks*, 776 F.2d 455 (4th Cir.1985), *amended on rehearing en banc*, 802 F.2d 731 (4th Cir.1986), an attorney at trial asked the district judge about the order in which he would pick jurors from the list. The court responded that although it couldn't

tell at that early stage, it "ordinarily . . . start[ed] . . . counting from the top" and that it would be reasonably fair for counsel to assume the same procedure. *Id.* at 459. Defendants exercised all of their peremptory strikes against jurors toward the top of the list. The court, however, started counting from the middle of the list. On appeal, the Fourth Circuit reversed, finding that "[t]he practical effect of defendants' counsels' not unreasonable belief that the jury would be chosen largely or substantially from the top of the list was to frustrate the exercise of their peremptory strikes." *Id.* at 460–61.[10]

We face a parallel problem here—the defendants held an incorrect, yet reasonable belief about the judge's method of ordering the jurors based on misleading information from the court, which prevented the intelligent exercise of the peremptory challenges to which they were entitled. Where, as here, a defendant is faced with more objectionable jurors than he has peremptory strikes, he must make intelligent use of those strikes by considering strategic factors such as the strength of his objection to a potential juror and the likelihood that she will serve on the petit jury instead of as a mere alternate (or not at all). Although the court's chosen method of jury selection need not provide complete information on each factor, *see, e.g., United States v. Blouin*, 666 F.2d 796 (2d Cir.1981) (holding "jury box" method used by court did not unduly restrict exercise of peremptories, even though it did not allow counsel to compare all jurors before exercising its strikes), any information it *does* provide should be correct information. The court's misleading description here caused defendants' incorrect predictions of the likelihood that each potential juror would be in the "first twelve" and thus sit on the petit jury. Because defendants had inadequate notice of the judge's actual method of ordering potential jurors, their strategic decisions based on a juror's likelihood of sitting on the petit jury were completely subverted. When strategy takes a back seat to chance in this manner, the result can hardly be considered the *intel-*

---

**10.** On rehearing, the Fourth Circuit affirmed the majority panel's holding on these grounds and also found reversible error on an additional ground. *United States v. Ricks*, 802 F.2d 731 (4th Cir.1986).

*ligent* exercise of peremptory challenges to which a defendant is entitled.

■■■ The government also asserts that the way in which defense counsel exercised their strikes suggests that they in fact were aware of the judge's jury selection method, despite the misleading description. Our review of the record revealed no reason to question defense counsel's veracity. In fact we find this argument bordering on meretricious in light of the immediate, numerous, and vehement objections of defense counsel during the judge's recitation of the jury list. *See supra* n. 8. In addition, we reject any implication that because the government asserts an understanding of the method actually used by the judge, the method should also have been clear to defense counsel. The government's knowledge of Judge Alesia's intentions appears to be based, at least in part, on a recognition of his jury selection procedures from prior appearances in his courtroom: "We understood how the Court was going to be selecting the jury ... it is not improper at all to follow this procedure in this case, just as [Judge Alesia] do[es] in every other case where [he] select[s] the jury." Trial Tr. Vol. 1A, at 211 (Feb. 13, 1995). Judge Alesia also referred to his routine procedures in response to defendants' objections: "If there is any misunderstanding—I have done this in ever[y] case I ever tried, and I never got a complaint." *Id.* at 210. Certainly, if defense counsel had actual knowledge of Judge Alesia's routine jury selection procedure (and no reasonable belief that he would deviate therefrom), their claim of impairment would fail. However, in the absence of this knowledge, Judge Alesia's jury selection routine is irrelevant. A defendant's right to the intelligent exercise of peremptory strikes cannot be forfeited merely because counsel was not, in the absence of uniform rules of the court or actual notice, familiar with a particular judge's unique procedural protocol during jury selection.

## B. William Underwood

■■ After conviction on his guilty plea, William Underwood received a two-point re-duction from his thirty-four-point base offense level for demonstrating an acceptance of responsibility for his offense under Sentencing Guideline § 3E1.1(a). Underwood also desired, but did not receive, an additional one-point reduction under § 3E1.1(b), which provides:

> If the defendant qualifies for a decrease under subsection (a), and the offense level determined prior to the operation of subsection (a) is level 16 or greater, and the defendant has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps:
>
> > (1) timely providing complete information to the government concerning his own involvement in the offense; or
> >
> > (2) timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently,
>
> decrease the offense level by 1 additional level.

U.S.S.G. § 3E1.1(b) (1994).[11] The district court refused this additional one-point reduction. Although the court referred to § 3E1.1(b) generally, its findings went only to subsection (b)(2), holding that Underwood did not timely notify the government of his intention to plead guilty. Underwood does not contest the finding that he did not merit a one-point reduction under subsection (b)(2). Instead, he claims that the court erred because it refused the one-point reduction without addressing whether he was entitled to a reduction under subsection (b)(1) for timely providing complete information regarding his involvement in the offense to the government.

Underwood's argument that the court was obligated in this case to make findings regarding his eligibility for a one-point reduction under subsection (b)(1) fails for one simple reason: Underwood did not make this argument before the district court. We can

---

11. The district court used the Sentencing Guidelines that became effective November 1, 1994, the guidelines in effect on the date of sentencing.

see no reason to demand that the court address whether Underwood merited a reduction under subsection (b)(1) when Underwood never suggested to the court that he timely provided complete information about his offense to the government, the prerequisite to receiving a reduction under that subsection. The instant case is thus distinguishable from *United States v. Ortiz*, 63 F.3d 952, 955–56 (10th Cir.1995), relied on by Underwood, in which the Tenth Circuit remanded because the district court failed to make findings on the subsection (b)(1) argument actually made by the defendant. In contrast, although Underwood cited to § 3E1.1(b) as a whole, he argued that he qualified for the one-point reduction only on the ground that he timely notified authorities of his intention to plead guilty, which would provide a basis for a reduction only under subsection (b)(2). The court is not obliged to make explicit findings on issues not argued by the defendant. *Compare* Fed.R.Crim.P. 32(c)(1) (requiring district court to make findings on matters controverted by the defendant or to determine that the matter would not affect sentencing).

In any event, the court adopted the findings of the presentence report ("PSR"), which found that Underwood did not timely provide complete information regarding his involvement in the offense, as required by subsection (b)(1). Underwood does not argue on appeal that this finding is clearly erroneous. *United States v. Wetwattana*, 94 F.3d 280, 285 (7th Cir.1996) ("The district court's acceptance of responsibility determination is a factual finding, which we review for clear error."). If he had, however, we would not be able to find clear error. The PSR's findings support the decision not to reduce Underwood's sentence under subsection (b)(1) and Underwood, who bore the burden of proof, *Wetwattana*, 94 F.3d at 285, presented no contrary evidence. *See, e.g., United States v. Taylor*, 72 F.3d 533, 547 (7th Cir.1995) (holding district court may rely entirely on factual findings of PSR if defendant does not offer any evidence of its inaccuracy).

## III. Conclusion

For the reasons discussed above, we reverse the convictions of Chris Messino, Clement Messino, Dick Messino, and Paul Messino, vacate the sentences and orders of forfeiture based on those convictions, and remand the case to the district court. Underwood's sentence, which is unaffected by this reversal, is affirmed.

REVERSED and REMANDED in part and AFFIRMED in part.

FLAUM, Circuit Judge, concurring in the judgment.

In this case, although an able and experienced trial judge applied his usual method of jury selection, the defendants were materially misled about the procedure under which they were operating. On these unique facts, to uphold the defendants' convictions would undermine the right to peremptory challenges codified in the Federal Rules of Criminal Procedure. I therefore agree with the majority that the defendants' convictions must be reversed. I am less than sanguine, however, about the continued vitality of *Swain*'s most sweeping rhetoric.[1] For this reason, and because these appeals do not require us to decide the issue, I would not employ this case to endorse a broad rule of automatic reversal, applicable whenever a defendant has suffered an infringement of his right to exercise peremptory challenges.

Two factors convince me that reversal is called for in the present case. First, what occurred below was not merely a technical violation of Rule 24. As Judge Eschbach demonstrates, the defendants were operating under a misapprehension as to the ordering of prospective jurors: "Because defendants had inadequate notice of the judge's actual method of ordering potential jurors, their strategic decisions based on a juror's likeli-

---

1. The majority cites *Swain* for the proposition that "[t]he denial or impairment of the [peremptory] right is reversible error without a showing of prejudice." 380 U.S. at 219, 85 S.Ct. at 835. Of equal note is the sentence that immediately follows and that serves as the premise underlying the no-prejudice rule: " '[F]or it is, as Blackstone says, an arbitrary and capricious right, and it must be exercised with full freedom or it fails of its full purpose.' " *Id.* (quoting *Lewis v. United States*, 146 U.S. 370, 378, 13 S.Ct. 136, 139, 36 L.Ed. 1011 (1892)) (alteration in original). As I discuss below, with the premise in question, the rule may be suspect.

hood of sitting on the petit jury were completely subverted." Moreover, it was critical for defense counsel to understand which peremptory strikes were being exercised against whom. Although Rule 24 leaves considerable discretion to the trial court in choosing the precise manner of jury selection, the Rule expressly regulates both the allocation of peremptories and the object of their use: "[A]dditional peremptory challenges [granted for alternate jurors] may be used against an alternate juror only, and the other peremptory challenges allowed by these rules may not be used against an alternate juror." Fed. R.Crim.P. 24(c). This explicit limitation only underscores the gravity of the defendants' impairment.

Second, this case does not involve considerations that might warrant more forgiving appellate treatment. *See, e.g., Ross v. Oklahoma,* 487 U.S. 81, 90, 108 S.Ct. 2273, 2279, 101 L.Ed.2d 80 (1988) ("[T]he concept of a peremptory challenge as a totally free-wheeling right unconstrained by any procedural requirement is difficult to imagine."); *United States v. Annigoni,* 96 F.3d 1132 (9th Cir. 1996) (en banc) (reaffirming rule of automatic reversal where district court erroneously sustained government's *Batson* challenge to defense's exercise of peremptory). Future claims involving the denial of peremptories will more typically present the factual scenario that divided the Ninth Circuit in *Annigoni*: a district court that has given a wide berth to the Scylla of *Batson* only to crash against the Charybdis of the peremptory prerogative. It is debatable whether reversal is always mandated in such circumstances. *See Annigoni,* 96 F.3d at 1148 (Leavy, J., dissenting) ("Because the peremptory challenge has changed [post-*Batson*], our review of the trial court's scrutiny of its exercise must change, too."). On the one hand, a trial court applying *Batson* arguably should be left with some margin for error. *See United States v. Annigoni,* 68 F.3d 279, 284 (9th Cir.1995) (Noonan, J.) ("The reason for this 'substantial latitude' is the danger of the district court being whipsawed—damned if it does and damned if it doesn't."), *rev'd on reh'g,* 96 F.3d 1132 (9th Cir.1996) (en banc). A too-rigid devotion to the peremptory on the part of appellate courts could have the paradoxical effect of fueling the perception that the right has become an unaffordable luxury, rather than a valuable safeguard of a fair trial. *See Annigoni,* 96 F.3d at 1150 (Kozinski, J., dissenting). In the wake of *Ross,* moreover, it is difficult to argue that the loss of a peremptory is the type of structural defect that necessitates reversal in all cases. *See Annigoni,* 96 F.3d at 1148–49 (Leavy, J., dissenting); id. at 1150 (Kozinski, J., dissenting); 68 F.3d at 285 (Noonan, J.). On the other hand, because it is notoriously difficult to estimate the effect of a juror on the outcome of a trial, questions of jury selection tend to defy harmless-error analysis. The prospect that the loss of peremptory challenges will inevitably be considered harmless should cause a court to swallow hard before abandoning a rule of automatic reversal. *See Annigoni,* 96 F.3d at 1150 (Kozinski, J., dissenting). In the instant case, however, we face no such dilemma. No countervailing constitutional imperative led the district court to impinge upon the defendants' right to the exercise of their peremptories; there simply (and unfortunately) was a critical miscommunication between the bench and bar. Given the significance of the error that occurred here and the lack of any compelling reason to afford expanded latitude to the trial court, this case does not present an occasion to examine whether the denial of peremptory challenges should ever be subject to harmless-error review.