In the
United States Court of Appeals
For the Seventh Circuit

Nos. 96-3866, 96-3867, 96-3868, 96-3869, 96-3870

United States of America,

Plaintiff-Appellee,

v.

Joseph Polichemi, et al.,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 94 CR 555--William T. Hart, Judge.

Argued January 4, 1999--Decided January 13, 2000/*

Before Flaum, Rovner, and Diane P. Wood, Circuit
Judges.

Diane P. Wood, Circuit Judge.  Not everyone has a
perfect understanding of the complex workings of
modern financial markets, and unfortunately,
sometimes unscrupulous individuals manage to
exploit that fact for a period of time. This
case, at its outset, involved seven such
individuals, who allegedly engaged in a
breathtakingly ambitious phony investment scheme
through which they bilked nearly 30 investors out
of more than $15 million. Their largest patsy was
the Chicago Housing Authority, which lost more
than a third of its pension fund, some $13
million, in the scheme. The CHA's former director
of employee benefits, John Lauer, landed in
prison for fraud and related offenses as a result
of these dealings. See United States v. Lauer,
148 F.3d 766 (7th Cir. 1998).

The present appeal comes to us from the
convictions after a jury trial of four of the
defendants, Joseph Polichemi, Lyle "Pete" Neal,
Oscar William Olson, and Charles Padilla, on
assorted counts of wire fraud, money laundering,
conspiracy, and perjury. A fifth, Larry
Oesterman, who pleaded guilty, argues that his
sentence is too harsh. Although taken together
the four who went to trial have raised nearly a
score of issues for our consideration, we
conclude that the trial court's handling of the

defendants' effort to strike a juror for cause was an error that fundamentally tainted the fairness of the trial. Under this circuit's decision in United States v. Underwood, 122 F.3d 389 (7th Cir. 1997), we have no choice but to reverse and remand for a new trial. This error was irrelevant to Oesterman, because of his guilty plea. Finding no error in the district court's sentencing decision, we affirm Oesterman's sentence.

I

We need not delve into the details of the scheme, given the fact that they are not necessary for our analysis of the jury selection problem. Briefly, however, they are as follows. Polichemi, Neal, Olson, Padilla, and Oesterman, along with others not relevant here, devised a system under which they marketed so-called "prime bank instruments" to investors (i.e. victims). They described these "prime bank instruments" as multi-million-dollar letters of credit issued by the top 50 or 100 banks in the world. The defendants told their victims that they could purchase these instruments at a discount and then resell them to other institutions at face value; the difference in price represented the profits that would go to the defendants and their "investors." This was nothing more than a song and dance: the trades were fictional; there was no market for the trading of letters of credit; and nothing capable of generating profits ever occurred. Somehow, notwithstanding the implausibility of the "prime bank instruments" to one familiar with normal business practice for letters of credit, they managed to persuade their victims to give them money to finance the purchase of the phantom discounted instruments. While this did not earn a cent for any of the investors, it definitely changed the defendants' own lifestyles. Polichemi, for example, was living in his sister's 2-bedroom condominium in Florida when things began, but he ended up in a $6.2 million home. Olson's and Neal's stories were similar.

Between 1991 and 1994, the defendants collected more than $15 million in this way. As noted above, their largest source was the CHA, which turned over more than $13 million of its pension funds to the defendants, thanks in large part to the unfaithful Lauer. They passed the monies they received through various bank accounts (often Swiss), used some of the money to pay off prior investors and old debts, and spent the rest on themselves. Each person had his own role to play. Polichemi was the president of "Copol," a company that purportedly traded in the prime bank instruments. He held himself out to be one of a

handful of people in the world with a license to trade these "securities." Neal was president of Konex Holding and Konex Marketing, companies that marketed Copol's product through a network of salespeople. Olson was an attorney for both Copol and Polichemi, in addition to being a participant in many of the deals at issue. Padilla was Copol's "stateside banker." He served as a reference for the other defendants and provided reassurance of Copol's soundness and success to potential investors. Oesterman was one of Neal's salespeople and a director at Konex marketing. These five were allegedly joined by Lauer, Edward Russey (another salesperson for Neal who pleaded guilty and testified pursuant to a plea agreement), and John DeVincens, a Konex attorney who was later acquitted on all charges by the jury.

II

In the end, the final benefit the defendants reaped from their scheme was an indictment from the grand jury in the Northern District of Illinois. Count 1 of the indictment charged the entire group with a scheme to defraud in violation of 18 U.S.C. sec.sec. 1343 and 2. Counts 2 through 15 charged the individual defendants with engaging in wire transmissions in furtherance of the fraud. Count 16 accused Polichemi, Neal, Olson, and DeVincens of conspiring to launder money in violation of 18 U.S.C. sec. 371, and Counts 17-26 charged that individual defendants had committed specific money laundering offenses in violation of 18 U.S.C. sec.sec. 1956(a)(1)(A)(i), 1956(a)(2)(B)(i), 1957, and 2. Finally, Counts 27-33 involved perjury charges against Padilla (27-29), DeVincens (30), and Neal (31-33), in violation of 18 U.S.C. sec. 1621(1). As noted above, DeVincens was acquitted; Russey pleaded guilty and is not involved in this appeal; Oesterman pleaded guilty and raises only sentencing challenges on appeal; and Polichemi, Neal, Olson, and Padilla (to whom we refer as the Polichemi defendants for convenience) were each convicted on some or all of the charges brought against them and appeal both their convictions and sentences.

III

At this court's direction, the Polichemi defendants filed one consolidated brief in which they addressed issues common to all four, and separate supplemental briefs on their individual issues. Oesterman, of course, filed his own brief. Because we find it dispositive of the appeals of the Polichemi defendants, we address

first their complaint about the jury selection process. It centers on the district court's handling of their request to strike potential jurors Lorena Nape, John Buck, and David Maines for cause. Under the system the trial court adopted, the defendants were to have 10 peremptory challenges collectively, plus one additional challenge for each two jurors selected as alternatives. After sixteen potential jurors had been qualified, the judge would call for simultaneously submitted peremptory challenges and then empanel those who were not struck.

Jury selection began on May 15, 1996. A number of jurors were excused for cause during the morning session. Among the prospective jurors called after the lunch break were Nape, Buck, and Maines. Both Buck and Maines stated, in response to questions posed during the voir dire, that they would tend to credit testimony from a law enforcement officer more than testimony of a lay witness. Maines noted that his wife's side of the family included several police officers, but he indicated that he did not believe this would affect his ability to be fair and impartial. On the other hand, he said that he tended "to have a less scrutinizing point of view when it comes to government officials and police officers." Buck said that he would start out believing the testimony of a law enforcement agent more than the testimony of a lay witness. Faced with these damaging statements, the prosecutor elicited statements from both men that they could, in the final analysis, reach a verdict solely based on the evidence they heard in the courtroom. On that record, the court denied the defense motions to excuse Maines and Buck for cause, and the defendants used two of their remaining peremptory challenges to strike them from the panel.

Nape's situation was somewhat different. At the time of the trial, Nape was a 15-year employee of the U.S. Attorney's Office for the Northern District of Illinois, based in Chicago--precisely the same office from which the prosecuting attorneys came. At oral argument and in a letter filed after argument, the AUSAs (in response to questions posed by this court) indicated that the official who signed the indictment did not have supervisory authority over Nape, because she was a secretary in the Civil Division. Nonetheless, it also appears that the sharing of work from division to division within the U.S. Attorney's Office led to varying levels of communication between the employees of the Civil Division and of the Criminal Division. See Tr. 176-77 (when asked whether her work had involved any assignments from the Criminal Division, Nape responded "maybe in the asset forfeiture area, of course, that seems to be slowing down or going

mostly criminal now."); Tr. 179 (Nape admitted to recognizing the names of the prosecuting attorneys in the case, and being aware that they worked in her office.). See generally Attorney General, Memorandum on Coordination of Parallel Criminal, Civil, and Administrative Proceedings (dated July 28, 1997), available at <http://www.usdoj.gov/ag/readingroom/ 970728.htm> (calling for information-sharing among divisions during the investigation and prosecution of cases, in order for the government to allocate its resources efficiently and come to effective, comprehensive settlements).

Based on her affiliation with the prosecutor's office, the defendants moved to strike Nape for cause as well. Even though, in response to questions, Nape stated that she could be fair and impartial, the defendants took the position that at a minimum she was excludable for cause on the ground of implied bias. As before, the court denied the motion, and the defendants had to use a peremptory challenge to remove her from the jury.

The Polichemi defendants argue that the district court erred in all three of its rulings rejecting their challenges for cause, with respect to prospective jurors Buck, Maines, and Nape. These errors forced them to use peremptory challenges to eliminate the objectionable panel members, which in turn, they argue, violated their Fifth Amendment due process rights by impairing the intelligent exercise of their peremptory challenges. They rely on this court's decision in United States v. Underwood, 122 F.3d 389 (7th Cir. 1997), cert. denied sub nom. United States v. Messino, 118 S.Ct. 2341 (1988), to show that this error is a structural one requiring automatic reversal.

Our analysis of these claims will follow that basic order. First, we consider whether the district court erred in any of the three rulings on the challenges for cause. If not, then we would have no occasion to proceed further with this ground of the appeals. Second, assuming at least one of those decisions was in error (given the fact that defendants here exhausted all their peremptory challenges), we must decide whether the automatic reversal rule of Underwood applies in these circumstances, or if this was a lesser error subject to harmless error analysis, as in our more recent decision in United States v. Osigbade, 195 F.3d 900 (7th Cir. 1999). If the automatic reversal rule applies here, then there is nothing left to do with the Polichemi defendants but to reverse the convictions and remand for further proceedings; if not, then we would proceed to a harmless error analysis.

Before proceeding down this path, we acknowledge that the circuits have been split on the question whether the automatic reversal rule of Swain v. Alabama, 380 U.S. 202, 218 (1965), still applies to a situation in which trial court error with respect to challenges for cause forces a defendant to use up her peremptory challenges, thus effectively reducing the number of such challenges below that are permitted in Fed. R. Crim. P. 24(b). Courts following the automatic reversal rule include (in addition to our own, as reflected in Underwood), the Fifth Circuit, in United States v. Hall, 152 F.3d 381, 408 (5th Cir. 1998), quoting United States v. Nell, 526 F.2d 1223, 1229 (5th Cir. 1976), the Ninth Circuit, in United States v. Martinez-Salazar, 146 F.3d 653 (9th Cir. 1998), cert. granted, 119 S.Ct. 2365 (1999), the First Circuit, in United States v. Cambara, 902 F.2d 144, 147 (1st Cir. 1990), the Third Circuit, in United States v. Ruuska, 883 F.2d 262, 268 (3d Cir. 1989), the Fourth Circuit, in United States v. Ricks, 776 F.2d 455, 461 (4th Cir. 1985), and the Sixth Circuit, in United States v. Hill, 738 F.2d 152, 153-54 (6th Cir. 1984). The Eighth Circuit and the Tenth Circuit take the opposite approach, under which they regard errors in denying challenges for cause as reversible only if the eventual jury that sat was biased--in other words, only if the error was not harmless. See United States v. Sithithongtham, 192 F.3d 1119, 1123 (8th Cir. 1999); Getter v. Wal-Mart Stores, 66 F.3d 1119, 1122 (10th Cir. 1995); see also Ross v. Oklahoma, 487 U.S. 81, 88 (1988). As we explain in more detail below, this court has taken a middle ground, under which some such errors trigger the automatic reversal rule and others do not. The Supreme Court will be speaking soon on the subject, in Martinez-Salazar, but unless or until we learn that we have erred, we must follow our own circuit's precedents.

We can dispose of the challenges to prospective jurors Buck and Maines relatively easily. In both those cases, the individuals made some remarks during voir dire that indicated they would harbor an actual bias in favor of witnesses from the law enforcement community, but upon further questioning, they both promised to evaluate the evidence fairly and to decide the case based on what was presented to them. We review a trial court's decision whether to dismiss a juror for cause deferentially, recognizing that the judge on the scene is in the best position to evaluate the juror's ability to serve. United States v. Beasley, 48 F.3d 262, 266 (7th Cir. 1995); United States v. Casey, 835 F.2d 148, 151-52 (7th Cir. 1987). We cannot say on this record that the district court clearly erred when it concluded,

after full questioning, that the defendants had failed to justify striking prospective jurors Buck and Maines for cause. Thus, we need not address the question whether the defendants' choice to use peremptory challenges for them infringed their due process rights. Peremptory challenges are most often used to eliminate from the jury those whom the defendant has no other way to remove. Since the district court committed no reversible error in these two rulings, no further comment is necessary.

The situation with prospective juror Nape is significantly different. As a long-time employee of the same U.S. Attorney's Office that was handling the prosecution, Nape could not avoid a public association with the lawyers for one side of the case. While she assured the trial judge that she believed she could be fair and impartial, such assurances cannot be the last word in these circumstances. Considering the deferential standard of review, we do not quarrel with the district court's conclusion that Nape did not consciously harbor ill will toward the defendants, or good will toward the prosecution. But the court erred in stopping its inquiries there. In addition to the kind of overt, actual bias that the court was looking for, a prospective juror might be excludable for implied bias.

While the term "implied bias" is not one that is used often, the concept is nonetheless well established in the law. Indeed, the risk of implied bias lies behind many of the rules that require excusing a juror for cause. A court must excuse a juror for cause if the juror is related to one of the parties in the case, or if the juror has a financial interest in the case. See, e.g., United States v. Annigoni, 96 F.3d 1132, 1138 (9th Cir. 1996); Getter, 61 F.3d at 1122. It is possible, of course, that a particular juror may be quite capable of maintaining her objectivity, even if her nephew is a lawyer in the case, but the relationship is so close that the law errs on the side of caution. Indeed, much the same rationale underlies the statute that requires disqualification of judges when the risk of at least the appearance of partiality or the risk of an unconscious tendency to favor one side is particularly great. See 28 U.S.C. sec. 455(b) (requiring disqualification when, for example, the judge or an immediate member of her family has a financial interest in the case, or when a close relative of the judge is a party or lawyer in the case). In many, if not most, such cases, the judge will in fact be unbiased and capable of rendering a fair decision, but the need to prevent even an appearance of partiality leads to a type of implied bias rule.

In its decision in United States v. Haynes, 398 F.2d 980, 984 (2d Cir. 1968), the Second Circuit traced the implied bias doctrine back to Chief Justice John Marshall's opinion in United States v. Burr, 25 Fed. Cas. 49 (No. 14692g) (C.C. Va. 1807), one of a series of opinions in the famous prosecution of Aaron Burr. In Burr the Chief Justice addressed the ways in which the law strives to assure an impartial jury:

Why is it that the most distant relative of a party cannot serve upon his jury? Certainly the single circumstance of relationship, taken in itself, unconnected with its consequences, would furnish no objection. The real reason of the rule is, that the law suspects the relative of partiality; suspects his mind to be under a bias, which will prevent his fairly hearing and fairly deciding on the testimony which may be offered to him. The end to be obtained is an impartial jury; to secure this end, a man is prohibited from serving on it whose connexion with a party is such as to induce a suspicion of partiality. The relationship may be remote; the person may never have seen the party; he may declare that he feels no prejudice in the case; and yet the law cautiously incapacitates him from serving on the jury because it suspects prejudice, because in general persons in a similar situation would feel prejudice.

25 Fed. Cas. at 50. From that time to the present, the federal courts have included among the reasons supporting a challenge for cause the kinds of presumptive sources of bias to which the Chief Justice referred. In Haynes, the Second Circuit wrote that

[a]t common law, jurors were challengeable on principle for bias for partiality due to kinship, interest, former jury service in the same cause, or because the prospective juror was a master, servant, counselor, steward, or of the same society or corporation. . . . Not only have these common law grounds for causal challenge retained their vitality, . . . but to them have been added others from which prejudice or bias may be implied.

398 F.2d at 984 (internal citations omitted). See also United States v. Torres, 128 F.3d 38, 43 (2d Cir. 1997) (recognizing three possible grounds for challenges for cause: those based on actual bias, those based on implied bias, and those based on "inferable" bias); United States v. Nell, 526 F.2d at 1229 (5th Cir. 1976); United States v. Dellinger, 472 F.2d 340, 367-69 (7th Cir. 1972) (noting that prospective jurors may be unacceptably biased for a variety of reasons,

and, because they themselves are often unaware of these actual biases, it is essential to explore their backgrounds and attitudes in order to uncover them).

Here, prospective juror Nape was a "servant"--that is, employee--of the particular office representing the United States, that of the U.S. Attorney for the Northern District of Illinois. We offer no comment on the application of the implied bias concept to links more remote than the one she had, such as affiliation with a different agency of the United States in Chicago, or affiliation with a different part of the Department of Justice. In this case, unfortunately, the fit was perfect. Although the government has argued that she should be disqualified only if she was under the actual supervision of the officer signing the indictment, we think that fine-tunes matters too far. The U.S. Attorney has authority over the entire office and can manage its personnel as he sees fit. The court therefore erred when it denied defendants' motion to dismiss Nape for cause.

Given this error, what should be its consequence under our decisions in Underwood and Osigbade? In Underwood, the district court gave a confusing explanation of the system it was planning to use for jury selection. Under a misapprehension about the actual system, the defendants used their peremptory challenges on a number of prospective jurors whom they would not have chosen had they understood the court's plan. This court, noting that the specific right to peremptory challenges is found in Fed. R. Crim. P. 24(b), not the Constitution, held that "the 'right' to peremptory challenges is denied or impaired only if the defendant does not receive that which [statutory] law provides." 122 F.3d at 392 (internal quotations and citations omitted). Recognizing that not all restrictions on the right to peremptory challenge constitutes the denial or impairment of the right, the court held that harmless error analysis was nonetheless inappropriate when a fundamental denial or impairment had occurred.

In Underwood, the fact that the entire process for exercising peremptory challenges had been misunderstood supported a finding of a denial or impairment fundamental enough to justify application of the Swain automatic reversal rule. This was true even though there was no showing that the jury that actually sat was biased or could not be impartial. On the other hand, United States v. Osigbade presented a case of a clerical mistake that led to one juror's being excused and another being substituted in her place. 195 F.3d

at 901-02. Using the "struck jury" selection system, both sides had questioned the entire venire, completed their challenges for cause, and then had submitted a list of peremptory challenges to the court. The court reviewed the peremptory challenges and then compiled the list of jurors, including alternates, for trial. After it entertained Batson challenges, it read off a list of the jurors who had been selected. At that point the parties alerted the court to the fact that one juror on that list had already been excused for cause. The court called the next name on the list. While waiting for that individual to return to the courtroom, the parties discovered that one prospective juror, Rhoda Richardson, had inadvertently been deleted from the list, because the court erroneously thought the government had struck her. Efforts to find her were unsuccessful, and the court eventually replaced her with one of the alternates.

These facts, we found, did not add up to such a basic impairment of the right to use peremptory challenges that the automatic reversal rule of Swain and, by then, Underwood, should be applied. As in Underwood, we recognized that some jury mistakes justify automatic reversal and others do not. Id. at 904. In Osigbade, automatic reversal was not required for several reasons. First, the defendant did not run out of peremptory challenges. Second, there was no evidence that the mistaken dismissal of the one juror resulted in anyone's being seated to whom the defendant would have objected (even with a peremptory challenge). Third, as the government argued in Osigbade, the essence of the defendant's complaint was that Richardson herself did not sit on the jury. Defendants have no legally cognizable right to have any particular juror participate in their case. See United States v. Duff, 76 F.3d 122, 125 (7th Cir. 1996).

While we understand that the distinctions here are fine, we have concluded that the district court's error in failing to excuse prospective juror Nape for cause goes to the fundamental integrity of the jury, and thus falls on the Underwood side of the line. Osigbade did not purport to overrule Underwood, nor could it have done so under this circuit's rules without undergoing circulation to the full court under the procedures established in Circuit Rule 40(e). Instead, it sensibly distinguished fundamental errors that undermine the integrity of the jury selection system from mere clerical errors that do not result in the seating of a single individual to which the defendant would have objected. (We know this to be the case, because the court used one of the previously submitted alternates in Osigbade after the problem became

clear.) Here, not only did the court fail to consider Nape's implied bias, but its error resulted in the subversion of the defendants' ability to exercise their peremptory challenges effectively. See Osigbade, 195 F.3d at 904. Unlike in Osigbade, the defendants ran out of peremptory challenges; unlike in Osigbade, the attorneys specifically told the court that the error resulted in the seating of jurors to whom they would have objected. These are important differences. When, under these circumstances, the court commits the legal error of failing to apply the principle of implied bias in its administration of challenges for cause, the structure of the jury selection process itself is compromised and the Underwood rule applies.

We therefore conclude that the convictions of defendants Polichemi, Neal, Olson, and Padilla must be reversed and the case must be remanded for a new trial.

IV

The only remaining issue we need consider, in light of our disposition of those four appeals, is Oesterman's challenge to his sentence. Oesterman pleaded guilty to one count of wire fraud, without any plea agreement. Although he was personally responsible for only $450,000, which he had obtained from victim investors, the district court relied on the relevant conduct provisions of the Sentencing Guidelines to hold him accountable for the entire $10-20 million loss. It found that he had joined the conspiracy and increased his offense level by 15, following U.S.S.G. sec. 2F1.1(b).

We review the district court's assessment of relevant conduct for clear error, including its determination of the questions whether the defendant participated in jointly undertaken criminal activity and whether the actions of the others were reasonably foreseeable to him. See United States v. Edwards, 115 F.3d 1322, 1325 (7th Cir. 1997); see also U.S.S.G. sec. 1B1.3 (1)(B). The record showed that Oesterman was a salesman of fraudulent securities for Konex. Neal solicited the CHA investment, and that investment was foreseeable to Oesterman according to evidence showing that Oesterman and Lauer (the CHA insider) were fellow participants in a Konex Summit Meeting. Oesterman also used Lauer as a reference (playing the role of a "satisfied investor") to facilitate his sales. This evidence justifies the district court's finding that Oesterman participated in the scheme as a whole and that its activities were reasonably foreseeable to him. In the absence of clear error with respect to the relevant conduct calculation, there is no reason to disturb Oesterman's

sentence.

V

   For the reasons stated, we therefore Reverse the convictions of Joseph Polichemi, Lyle E. Neal, Oscar W. Olson, and Charles Padilla and Remand for further proceedings consistent with this opinion. We Affirm the sentence imposed on Larry P. Oesterman.


/* This opinion was initially released in typescript.