**Dominick GRAHAM, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 94–CF–912, 96–CO–522.**

District of Columbia Court of Appeals.

Argued June 18, 1997.

Decided Dec. 4, 1997.

Chris Asher, Washington, DC, for appellant.

Elizabeth H. Danello, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and TERRY and REID, Associate Judges.

1. Graham was acquitted of first degree murder while armed and carrying a dangerous weapon.

REID, Associate Judge:

After a jury trial, appellant Dominick Graham was convicted of the lesser included offense of second degree murder while armed, in violation of D.C.Code §§ 22–2403, –3202 (1996).[1] He filed a timely appeal, contending that (1) the trial court should have declared a mistrial because a juror failed to disclose until jury deliberations that he knew a government witness; (2) his motion for a new trial, based upon the recantation of a government witness, should have been granted; and (3) the trial court erred in failing to give the jury additional instructions during jury deliberations. We affirm.

## FACTUAL SUMMARY

Graham, an inmate in the Central Treatment Facility of the District of Columbia jail, was charged with carrying a dangerous weapon, and first degree premeditated murder while armed of another inmate, William Thomas. Two other individuals, Christopher Thomas and Edward Williams, also were charged with the murder. Christopher Thomas admitted stabbing the decedent on August 6, 1993, and entered a guilty plea to second degree murder while armed. Williams entered a plea of guilty to voluntary manslaughter while armed, and testified against Graham.

During his testimony at Graham's June 1994 trial, Williams described Graham's role in the murder. He said he was "very certain" that Graham "was involved in [the] incident." On the day of the murder, Williams saw Graham and Christopher Thomas standing together in the day room. He approached the two men and "asked them what was going on." Graham said: "[w]e're about to smash this guy." Subsequently, he saw Graham talking with William Thomas, and observed Christopher Thomas come up behind the decedent and stab him several times with a "shank", a homemade knife. Williams also saw Graham stab the decedent once with a shank and watched him punch the decedent several times. Williams punched the decedent three or four times in

He was sentenced to fifteen years to life in prison.

the face and head and "stomped [him] about three times." Soon, Graham left the area of the day room where the murder took place and climbed to the second tier. Christopher Thomas threw his shank up to Graham. Later, Williams and Graham discussed plans to lie about the murder.[2]

Other witnesses confirmed Graham's involvement in the murder. Inmate Jimmy McGowan saw Graham and the decedent swing at each other. He also heard Christopher Thomas call Graham and saw him throw a knife up to Graham. Juan Butler observed the decedent and Graham together, looked as Graham proceeded to the second tier, and thought he heard Christopher Thomas tell Graham to "put this in my room" as he threw an object up to Graham. Barry Campbell heard someone call the name "Dominick" and say: "get rid of this" as he watched a man on the second tier bend down.

## ANALYSIS

### The Juror Bias Issue

Graham contends that the trial court should have declared a mistrial because juror number 292 failed to disclose during the *voir dire* that he knew Williams. The jury began deliberations on the morning of Friday, June 17, 1994. On Monday, June 20, 1994, juror number 292 called the trial court to report that his car had been stolen, and that he was stranded in Richmond, Virginia and unable to return to the District of Columbia. He had several conversations with court personnel, including the trial judge, regarding ways in which he could get back to the District that day. However, he never made it to court that Monday. When he arrived in court on Tuesday, June 21, 1994, the juror reported suddenly remembering that he knew government witness Williams. The trial judge decided to reopen the *voir dire* to question the juror. The court questioned the witness and offered the prosecutor and defense counsel an opportunity to inquire, but neither had any questions. The juror told the court that he knew "Everett" Williams "through [his]

daughter," but did not recognize him until he saw his address on one of the trial exhibits given to the jury at the time deliberations commenced.[3] Williams and the juror's daughter were classmates when they were teenagers, but did not date. However, Williams had visited the juror's house on approximately two occasions about three to five years before Graham's trial. The juror stated that he "really didn't know [Williams] that well, ... or even [try] to get to know him that well."

When the trial judge asked the juror:

[d]o you think that the fact that he came by your house a few times and that he was a friend of your daughter's, would that affect you in weighing the believability or the unbelievability of his testimony[,]

the juror replied:

I don't really think so. It's just that I thought I would mention it, ... that I had been in his company a few times.

The trial court asked government and defense counsel whether they wished to pose any questions to the juror. Both responded in the negative. However, defense counsel pressed for a mistrial, saying, *inter alia:*

given who the witness is—and I remain somewhat taken aback by the lateness of the disclosure—that Mr. Graham's position remains the same that the Court strike the juror and declare a mistrial.

Defense counsel also maintained that had the juror's knowledge of Williams been disclosed during the *voir dire,* defense counsel would have "exercised a peremptory strike if he was not successful in prevailing upon the Court to have this juror removed for cause."

Based upon the trial court's conversations with the juror while he was in Richmond regarding his efforts to get back to the District, the trial judge described the juror as "extremely conscientious" and credited his testimony. The trial judge stated, in part:

[I] know he's a conscientious person, he's not trying to get out of this jury or else he wouldn't have appeared here this

---

**2.** On cross-examination, Williams admitted that he told a police detective he was asleep at the time of the murder.

**3.** The record is silent as to why the juror remembered Williams through his address.

morning and he wouldn't have been so cooperative yesterday. Certainly, I too am taken aback that he didn't recognize Mr. Williams. And I recognize Mr. Williams's central role in this trial. Pretty hard not to. It's not surprising to me that he didn't recognize him by name. That is a very common name.

[I] think when you are the parent of a teenager who is probably bringing a whole slew of young men and women into and out of the house and the teenager doesn't have a notably bad or good relationship with one of many other teenagers, it is not incredible to me that he wouldn't recognize that young man as just another 17 or 19–year– old who was coming by the house. He obviously didn't have a serious relationship with his daughter and he obviously didn't have a negative relationship with his daughter or the juror would have focused on that. I think he was very clear, when I asked him the question, that his acquaintanceship with that young man—I'm not sure it even rises to the level of an acquaintanceship—would not affect him.

Based on all of these ... facts that I know about this juror, I don't think he has been tainted and I think he has demonstrated both by his conduct yesterday and by bringing this information to my attention that he would be candid with the Court....

The trial judge denied the request for a mistrial and instructed the juror "not to reveal or discuss in any way that you had this brief acquaintanceship with Mr. Williams at [your] home...."

■ We have said previously that "[t]he right to trial by an impartial judge or jury is fundamental and deeply embedded in American jurisprudence." *Hughes v. United States,* 689 A.2d 1206, 1207 (D.C.1997). Whenever a juror's impartiality is questioned, the trial judge is obligated, at least, "to reopen the *voir dire* to determine wheth-

er actual bias existed." *Id.* at 1210; *see also Smith v. Phillips,* 455 U.S. 209, 215, 102 S.Ct. 940, 944–45, 71 L.Ed.2d 78 (1982); *Young v. United States,* 694 A.2d 891, 894 (D.C.1997). A hearing to determine whether the juror is biased is essential because "[t]he seating of an actually biased juror is a structural error not subject to the harmless error rule." *Id.* (citing *Hughes, supra,* 689 A.2d at 1210). The burden is on the complaining party to "demonstrate that a juror failed to answer honestly a material question on voir dire, and then [to] further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984). Only reasons for concealing information which affect a juror's impartiality will be considered to affect the fairness of the trial. *Id.* Furthermore, " 'following a proper hearing, the determination of juror bias or prejudice lies particularly within the discretion of the trial court, reversible only for a clear abuse of discretion, and the findings of fact underlying that determination are entitled to great deference.' " *Young, supra,* 694 A.2d at 894 (quoting *Hill v. United States,* 622 A.2d 680, 683–84 (D.C.1993)).

■ Here, upon learning that juror number 292 suddenly remembered that he knew Williams, the trial court immediately called the juror for questioning. From the juror's responses to the trial judge's questions, it is clear there was no significant relationship between the juror and the witness. Indeed, the record contains no facts to support a finding of actual bias.[4] The juror had last seen the witness Williams three to five years before Graham's trial. When asked why he did not recognize Williams, the juror said: "It's been so long since I had seen him." Williams was a classmate of the juror's then teenage daughter, but the juror remembered seeing him at his house only a couple of times and "really didn't know [him]

---

4. Graham also argues that "[t]he trial judge failed to realize that, if the juror could not recognize the witness by name or by face then, the claim that he recognized him only by his address was suspect and, indeed, dubious." Graham had an opportunity to question the juror, or request that the trial court pose the questions, during the reopened *voir dire.* However, he chose not to pose any questions to the juror, and there is nothing in the record that suggests any meaningful tie between the juror and the witness. Mere conjecture and suspicion cannot serve as a basis for disqualifying a juror for actual bias.

that well, ... or even [try] to get to know him that well." Significantly, when the trial judge inquired whether the juror's prior contact with Williams would "affect [him] in weighing the believability or the unbelievability of his testimony," the juror stated: "I don't really think so."

■ The trial court credited the juror's responses, characterized him as "conscientious", found no "serious" or "negative relationship" between the juror's daughter and Williams, and concluded that "he has [not] been tainted" as a juror. " 'Our review is deferential because the question of prejudice turns substantially on the judge's appraisal of the juror's demeanor....' " *Young, supra*, 694 A.2d at 894 (quoting *Hill, supra*, 622 A.2d at 684). On the record before us, we cannot conclude that the juror, who had previously seen Williams only a couple of times, who had no significant conversations with him, and who had not seen him in three to five years, "failed to answer honestly a material question on voir dire." [5] *McDonough, supra*, 464 U.S. at 556, 104 S.Ct. at 850. Thus, we see no reason to disturb the trial court's findings. Accordingly, we conclude that Graham has not sustained his burden to prove actual bias.[6]

### The Recanting Witness Issue

Graham argues that the trial court erred in denying his motion for a new trial based upon the recantation of government witness Williams. Almost one year after the jury verdict in his case, Graham moved for a new trial based on the one-page affidavit of Williams. Williams maintained that he was coerced by the government and that his testimony against Graham was not true. He stated in pertinent part:

The evidence alluded [sic] during the course of the trial was not the factual events that transpired, but something that was orchestrated by the Government and rehearsed by me to aver to during the trial. I was compelled to commit perjury as a result of these fears for my life and the well being of my children. My testimony of Mr. Graham stabbing William Thomas in the chest and my being an eyewitness to these events were not true. I never saw these events, but, however, I was colluded [sic] into saying that I had seen the scenario because, I was also being charged with this crime. I sought to save myself only.

The government opposed Graham's motion for a new trial, stating, *inter alia*, that the recantation contained conclusory assertions and was unbelievable, and further, that even if the recantation were believed, it would not result in Graham's acquittal. Based upon the motion before it and the government's opposition, the trial court denied the request for a new trial "for the reasons stated by the government."

■ "Absent a clear showing of abuse of discretion, decisions of the trial court regarding the denial of a new trial will not be disturbed on appeal." *Smith v. United States*, 466 A.2d 429, 432 (D.C.1983) (citing *United States v. Johnson*, 327 U.S. 106, 111–12, 66 S.Ct. 464, 466–67, 90 L.Ed. 562 (1946) (other citations omitted)). In *Heard v. United States*, 245 A.2d 125 (D.C.1968), we adopted a five-prong test for determining whether the appellant sustained his or her burden regarding a motion for a new trial based on newly discovered evidence:

(1) the evidence must have been discovered since the trial; (2) the party seeking the

---

5. On the record before us, we cannot fault the trial court for failing to call Williams to question him regarding his prior contact with the juror.

6. Graham also complains that he was "deprived ... from exercising his right to peremptory challenge to exclude [the juror]." However, as we said in *Lyons v. United States*, 683 A.2d 1066 (D.C.1996), "the belated discovery of information about a juror which would have caused the defendant to use a peremptory challenge against her is an insufficient basis for reversing the denial of a motion for a mistrial." *Id.* at 1072;

(citing *Harris v. United States*, 606 A.2d 763, 765–67 (D.C.1992)). Moreover, "the possible deprivation of the exercise of a peremptory challenge does not mandate reversal because the relevant inquiry is whether the juror was actually biased against the defendant." *Id.* at 1071 (quoting *Harris, supra*, 606 A.2d at 766 n. 5). Because we sustain the trial court's finding that the juror was not actually "tainted" or biased, Graham's contention regarding deprivation of his right to exclude Williams by exercising a peremptory challenge must also fail.

new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such nature that in a new trial it would probably produce an acquittal.

245 A.2d at 126 (citing *Thompson v. United States*, 88 U.S.App. D.C. 235, 236, 188 F.2d 652, 653 (1951)). Generally, a hearing is not required for a motion on a new trial.[7] *Geddie v. United States*, 663 A.2d 531, 534 (D.C. 1995). In deciding whether the interest of justice requires a new trial, the trial court considers the ruling from the perspective of a " 'thirteenth juror' [to] determine whether 'a fair trial requires that the [claim presented in the motion for a new trial] be made available to the jury.' " *Id.* at 533 (citations omitted). We review the trial court's ruling on the motion for an abuse of discretion. *Id.* We will sustain the denial of the new trial motion if it is " 'reasonable and supported by evidence in the record.' " *Id.* (quoting *Townsend v. United States*, 549 A.2d 724, 726 (D.C.1988), *cert. denied*, 490 U.S. 1102, 109 S.Ct. 2457, 104 L.Ed.2d 1011 (1989)).

 We find it necessary to consider only the fifth prong of the *Heard* test, whether the presentation of the newly discovered evidence in a new trial "would probably produce an acquittal."[8] Based on the evidence presented at trial, Graham could have been convicted either as a principal or as an aider

and abettor. In light of the questions raised to the trial court during its deliberations, the jury apparently convicted Williams as an aider and abettor.[9] The evidence presented at Graham's trial, excluding that presented by Williams, was sufficient to sustain Graham's conviction as an aider and abettor. Three inmates, Juan Butler, Jimmy McGowan and Barry Campbell, gave testimony which demonstrated Graham's participation in William Thomas' murder. McGowan saw Graham and the decedent swing at each other at the time of the murder. He also heard Christopher Thomas call to Graham right after the murder and saw him throw a knife up to Graham. Campbell heard someone call the name "Dominick" and say: "get rid of this" as he watched a man on the second tier bend down. Butler saw the decedent and Graham together just before the murder, watched as Graham proceeded to the second tier after the murder, and thought he heard Christopher Thomas tell Graham to "put this in my room" as he threw an object up to Graham. The testimony of these men did not merely place Graham at the scene of the murder. It also established Graham's role as at least a facilitator of the crime and as a person who aided Christopher Thomas by concealing the shank or homemade knife used to stab the decedent. Consequently, we conclude that Graham has failed to demonstrate that the trial court clearly abused its discretion in denying his motion for a new trial based on the recanting affidavit of Williams.

7. Here, we apply the *Heard* test. In our past opinions, we have also referenced the test or standard for newly discovered evidence set forth in *Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir.1928), depending on the circumstances of the case. *See, e.g., Herbin v. United States*, 683 A.2d 437, 441 n. 4 (D.C.1996); *Brooks v. United States*, 683 A.2d 1369, 1370 n. 4 (D.C.1995); *Young v. United States*, 639 A.2d 92, 95 n. 6 (D.C.1994); *Johnson v. United States*, 537 A.2d 555, 562 n. 10 (D.C.1988); *Godfrey v. United States*, 454 A.2d 293, 300 n. 22 (D.C.1982).

8. Citing *Herbin, supra*, Graham maintains that the credibility of a recantation is a critical factor in assessing the new trial motion, and that here, it is significant that the judge who disposed of the new trial motion was not the trial judge. We conclude that the motions judge had a sufficient basis on which to resolve the motion for a new trial. Although Williams claimed that he "was under continuous duress by the government be-

cause [he] had children on the street," he presented no factual information to support this conclusory allegation. Nor did he present factual support for his allegation that he was not an eyewitness to the murder and did not see Graham stab the decedent. His claim is belied by his participation in the crime as evidenced by his plea of guilty to manslaughter while armed in connection with the decedent's death.

9. During its deliberations, the jury sent a note to the trial judge asking:

If we believe that Christopher Thomas committed first degree murder while armed, and if we believe that the defendant aided and abetted Christopher Thomas but did not know or suspect that Christopher Thomas had the intent to kill, is it necessary to find the defendant guilty of first degree murder while armed? Is it possible to find the defendant guilty of second degree murder while armed?

### The Jury Instruction Issue

■ Graham takes issue with the trial court's instruction on aiding and abetting, given before the jury began deliberations. He also challenges the trial court's decisions concerning the jury's request for additional instruction, and he claims that the trial court erred in denying his request, made during the jury's deliberations, for instruction on the lesser included offense of assault.

■ The trial court gave the aiding and abetting instruction set forth in CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.02 (4th ed.1993). Graham finds fault with this instruction, contending that

> the trial court should have made it clear to the jury that in determining the appellant's guilt or innocence, they should look at his state of mind rather than that of either of the two other codefendants. The court should also have instructed the jury that to convict the appellant as an aider and abettor they should be convinced that the appellant committed some overt acts which caused the death.

Part of Instruction No. 4.02, which the trial court read to the jury verbatim, specifies:

> [It is not necessary that the defendant have had the same intent that the principal offender had when the crime was committed, or that he have intended to commit the particular crime committed by the principal offender. An aider and abettor is legally responsible for the acts of other persons that are the natural and probable consequence of the crime in which he intentionally participates....]

Graham took no issue with this definition.[10] When the jury raised its question to the trial judge during deliberations regarding first and second degree murder and aiding and abetting, *see* n. 9, *supra*, the trial court instructed the jury to listen to the tape of its earlier instructions pertaining to first and second degree murder and aiding and abetting.

" 'Decisions regarding reinstruction of a jury are committed to the discretion of the trial court; absent abuse of that discretion we will not reverse.' " *Robinson v. United States*, 642 A.2d 1306, 1311 (D.C.1994) (quoting *Davis v. United States*, 510 A.2d 1051, 1052 (D.C.1986)). Here, the jury posed two very specific questions to the trial judge. Neither question asked for reinstruction regarding aiding and abetting. However, both questions related to first degree and second degree murder as well as aiding and abetting. The trial judge understandably was reluctant to give the jury a specific answer to the questions posed since "their question[s][are] so specific that I fear if I give a yes or a no answer, it virtually commands their verdict...." Because the trial court had already provided instructions regarding these terms, and because of the trial court's concern that it not dictate the outcome of the case, we cannot say the court abused its discretion by responding to the note as follows:

> Please listen to the tape-recorded instructions of first degree murder while armed, second degree murder while armed, and aiding and abetting. If you have any questions thereafter, please feel free to ask them.

Although the trial court advised the jury that it could ask additional questions after listening again to the instructions as specified, no further inquiries were raised.

■ Later, however, defense counsel informed the trial judge that he "believe[d] that a response to the [jury] note, consistent with the case law, would be to ask for a lesser included instruction...." By this time the jury already had alerted the court that it had reached a verdict.[11] The trial

---

10. Graham argues that to establish his guilt as an aider and abettor, it must be shown that he knew or could have reasonably contemplated that the principal intended a particular crime, here that the principal intended to kill the decedent. Our case law does not support this position. *See, e.g., Morriss v. United States*, 554 A.2d 784, 788–89 (D.C.1989) (citing *Hackney v. United States*, 389 A.2d 1336, 1342 (D.C.), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 95 (1979)).

11. Defense counsel was not able to reach the trial judge immediately because she was attending the annual Judicial Conference.

judge responded to defense counsel as follows:

Well, the primary reason I'm not going to do this and reopen their deliberations is that I don't think the requested instruction is responsive to their question....

There's a secondary reason, although I emphasize that it's not dispositive for me, and that is that at the time I gave instructions, we talked about lesser included offenses, we talked about murder in the second degree while armed. I gave it. There was no request for anything more minor than murder in the second degree while armed. But the overriding reason I'm not going to give it is I don't think it's responsive to their question.

Based upon the record on appeal, and our decision in *Robinson, supra,* we cannot say that the trial court abused its discretion in declining to give supplemental instruction concerning aiding and abetting or an instruction on the lesser included offense of assault.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*