**Marquis T. SAMS and Jibreel K. Reid, Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 93–CF–1265, 93–CF–1398.**

District of Columbia Court of Appeals.

Argued Nov. 13, 1996.
Decided Dec. 10, 1998.

Thomas G. Ross, Riverdale, MD, appointed by this court, for appellant Sams. Gregory C. Powell, Riverdale, MD, also appointed by this court, entered an appearance for appellant Sams.

Cynthia Jones, Public Defender Service, with whom James Klein, Samia Fam, and David Reiser, Public Defender Service, were on the brief, for appellant Reid.

Geoffrey G. Bestor, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese, III, Thomas C. Black, and Gina L. Simms, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, STEADMAN, and FARRELL, Associate Judges.

TERRY, Associate Judge:

Appellants Sams and Reid, along with two other defendants, were jointly charged with first-degree murder while armed [1] and possession of a firearm during a crime of violence (PFCV).[2] Reid was charged in addition with three counts of obstruction of justice,[3] based on threats he made to a government witness. After a three-week trial, the jury found both appellants guilty of the lesser included offense of second-degree murder while armed,[4] and found Reid guilty of obstruction of justice as charged. Sams was found guilty of PFCV, but Reid was acquitted of that charge.[5]

Both appellants contend on appeal that the trial court erred in the way in which it conducted the *voir dire* of the jury, particularly in not allowing them (or any of the

---

1. D.C.Code §§ 22–2401 and 22–3202 (1996).

2. D.C.Code § 22–3204(b) (1996).

3. D.C.Code § 22–722(a)(3) (1996).

4. D.C.Code § 22–2403 and 22–3202 (1996).

5. Co-defendant Marcus Boykin was found guilty of second-degree murder while armed and acquitted of PFCV. Co-defendant Clarence Blair was acquitted of all charges.

other defendants) to exercise a peremptory challenge to the last juror placed in the jury box after the government had made its final peremptory strike. Reid claims in addition that certain language in the court's self-defense instruction was erroneous and prejudicial. Sams maintains that the obstruction of justice counts against Reid were improperly joined with the other counts, and that the joinder, even if it was permissible under Rule 8 of the Superior Court Criminal Rules, was so prejudicial to him as to require the court to grant a severance under Rule 14. We reject all of these arguments and affirm the convictions of both appellants.

## I

### A. *The Government's Evidence*

On August 18, 1992, appellant Reid was involved in an argument with the decedent, Arthur Ward, a resident of Fort Davis Street, Southeast. Michael Brown, who witnessed the incident, testified that the two men argued in the street near Ward's home, and that although Ward threatened Reid with a knife, neither man was injured.

The following day, August 19, Reid and Ward resumed their quarrel. Richard Hearne, who also lived in the neighborhood, saw Reid approach Ward and heard him demand an apology. Frances McCalop, who at the time was Reid's girl friend, heard Ward call Reid a "white boy" and tell him, "Don't be coming around here, this isn't your territory"; she too heard Reid demand an apology. Both Hearne and McCalop then saw Ward produce a knife and start to swing it at Reid.[6] In response, Reid threw a large bottle of soda at Ward and then ran across the street. As Reid fled, McCalop heard him tell Ward, "Stay right there. I'll be right back."

Reid ran around the corner to an area where a group of his friends, including appellant Sams, had gathered to wash their cars. Tracy Lee, a member of that group, testified that Reid said he had been stabbed by "a dude around the corner" (although in fact he had not been stabbed). Reid asked Marcus Boykin to take him back around the corner so that he could "get" his assailant. The men all piled into two cars and drove to Fort Davis Street. Along the way, they encountered Ms. McCalop. She testified that Reid invited her to come along and see what he was about to do, but she declined because she had to go home.

The two cars pulled up in front of Mr. Ward, and all the men got out and approached him. Four witnesses testified that Reid went over to Ward and hit him in the face; three stated that Ward did not have a weapon in his hand at the time (the fourth was not asked about a weapon). Two bystanders, Jeffrey Wiggins and Julia Davis, testified that they did not see Ward holding a knife at any point during the confrontation.

Sams and the rest of the group began to circle around Ward after Reid had struck him. Michael Brown said that Reid and Ward began to fight, and that Sams joined in by punching Ward. Richard Hearne and Tracy Lee testified that Ward responded by pulling a knife and attempting to cut Reid with it. Lee said that Reid grabbed Ward's arm and stabbed him in the neck while both were holding the knife. Reid then wrested the knife from Ward and began stabbing him repeatedly with it as he forced Ward to the ground.

According to Lee, Sams then pointed a gun at Ward and tried to shoot him,[7] but the gun would not fire. Tracy Lee and Michael Brown both testified that Sams then struck Ward once or twice in the head with the gun. Richard Hearne also said that he saw Sams strike Ward in the head once or twice, but with a black object that looked like a tire iron.

Wiggins, Brown, and Lee each testified that Reid stabbed Ward repeatedly as he lay on the ground. Richard Hearne said that several men in the group, including Sams, took turns stabbing Ward, but he could not

---

6. According to McCalop, Ward threatened to beat Reid as his mother had beaten him. Reid later testified that Ward had threatened to beat him as his father had done, not his mother.

7. Gloria Powell, another passerby, testified that she heard one member of the group say, "Don't shoot him, I already stabbed him." Reid later testified that he was the one who said this.

be certain whether Reid was one of them. Julia Davis also saw Ward being stabbed while he was on the ground, but she could not say who did the stabbing. According to Hearne, the attack ended when Sams said "Let's go" to the rest of the group. After the men got into their cars, Jeffrey Wiggins saw Reid holding a bloody knife in his lap.[8]

Later that day, Reid called Frances McCalop at her home and said that he thought he had killed Arthur Ward. Reid told McCalop that he had tried to speak to Ward, but that Ward had begun swinging a knife, which Reid took away from him. McCalop testified that Reid called her several times after that and instructed her not to talk to the police about his involvement in Ward's death. According to McCalop, Reid told her a day or two after the murder that if she said anything to the police about his involvement, "his boys [were] gonna fuck me up." She construed this as a threat that Reid's friends "would try to beat me up or something" and took it seriously. McCalop said that in another conversation with Reid in September, about a month later, "he said, if he got locked up, his boys [were] gonna get me." Still later, in early October, Reid called her again at home and said, "Remember, I told you, if you talked to the police, my friends [were] gonna fuck you up."[9]

### B. *The Defense Evidence*

Of the four defendants, Reid was the only one who presented any evidence. He testified that the dispute between him and Mr. Ward began on August 18, when he went to visit a friend who lived in Ward's apartment building. When Reid and two companions knocked on the friend's door, Ward emerged from his apartment, called Reid a "white boy," and told the three men to leave. They left, but about a half-hour later Reid and Ward saw each other outside the building. After a brief exchange of words, their en-

counter ended with a handshake. There was no indication that Ward had a weapon.

The next day Reid and McCalop ran into Ward on the street, and once again Ward called Reid a "white boy." When Reid asked for an apology, Ward pulled out a knife and began swinging it at him. Reid responded by throwing a large plastic bottle of soda at Ward in self-defense. Ward then chased Reid around a car and threatened to beat him as his father had done. After Reid managed to escape, he met a group of his friends around the corner, one of whom was Sams.

Reid testified that he asked Marcus Boykin for a ride so that he could go back to Fort Davis Street to look for Frances McCalop. Reid, Sams, and several others got into two cars and drove back around the corner to Fort Davis Street. On the way there, the group saw Ms. McCalop and offered her a ride home, but she declined. Reid testified that he too wanted to go home, but when he saw Ward, he decided he would try to settle their dispute amicably, since they both lived in the same neighborhood.

When the two cars stopped in front of Ward, Reid told his friends not to "jump in unless [Ward] pulls out the knife." Reid approached Ward as he was going into his apartment building and pressed him again for an apology, but no apology was forthcoming; instead, the two men began to argue. Reid punched Ward in the face when he saw him reaching for the knife. Then, as Ward started to swing the knife in his direction, Reid backed up against the wall of the building. Reid grabbed the knife, and, as both men were struggling over it, he stuck it into Ward's neck. Ward fell to the ground.

At this point, Reid testified, his friends joined in the fight. Tracy Lee, in particular, began kicking Ward and stabbing him with a knife, but Reid did not know where that knife

---

8. An autopsy revealed that Arthur Ward had been stabbed nine times, that five of the wounds were in the back, and that eight of the wounds were consistent with having been inflicted by the same knife. The autopsy also showed that Ward had been struck in the head twice with a blunt object and that the blows had fractured his skull and the bones of his eye socket.

9. McCalop also testified that Reid had told her that one of the men who participated in the killing of Arthur Ward had a gun. Counsel for Sams immediately objected, and the court instructed the jury that McCalop's testimony regarding these conversations could be considered only as it related to Reid.

had come from. Reid also stated that he saw Sams with a gun in his hand, but he did not see Sams do anything with it. Reid told Sams not to shoot Ward because he (Reid) had already stabbed him. Reid took Ward's knife away from him when Marcus Boykin hit Ward in the arm with a pole.

Reid stated that he stopped attacking Ward after he initially stabbed him in the neck because he became frightened by all the blood. Moments later, when someone else said, "Let's go," Reid and his companions all got back into their cars and drove away. As they rode along the street, Reid threw the bloody knife into a sewer. Later that day, Reid called Frances McCalop and told her that he thought he had killed someone, but he denied ever intending to kill Mr. Ward and denied threatening Ms. McCalop.

## II

Pursuant to Super. Ct.Crim. R. 24(b), the trial court granted twelve peremptory challenges each to the prosecution and the defense. Because the four defendants were tried jointly, the court allocated three challenges to each defendant and employed a version of the so-called "jury box" system. The court seated fifteen potential jurors in the jury box (three of them in seats designated for alternates) and allowed strikes into the jury box only, not into the full venire panel.

The court told defense counsel that it expected them to confer with one another and to make their challenges in the order in which their names appeared in the indictment. Accordingly, since Reid was listed first, his counsel exercised his challenges in rounds one, five, and nine. The government struck first in each round, followed by the defendant whose turn it was; replacement jurors were seated in each round only after both sides had made their strikes. Thus, when the government made its final peremptory strike in round twelve, the replacement juror (No. 885) was seated only after all four defense counsel had also exercised their final strikes. Consequently, all four defendants were denied an opportunity to challenge the final replacement juror.

Reid argues that by restricting the defendants to striking prospective jurors seated in the jury box and prohibiting strikes into the panel, the trial court effectively impaired his ability to use his last peremptory challenge, because the replacement juror in the final round was not seated until after all the defense strikes had been exhausted. The government conceded at oral argument, and we agree, that this method of jury selection was functionally identical to the procedure which we disapproved in *Butler v. United States*, 377 A.2d 54 (D.C.1977).

In *Butler* the trial court employed a method of jury selection whereby replacement jurors were not seated until the conclusion of each round. We held that this procedure impaired, on the last round, "the defense exercise of its peremptory challenge" and that there was "no alternative but to reverse the [defendant's] conviction" under the then-current *per se* reversal rule. *Id.* at 56. In the instant case, the trial court similarly denied the defendants an opportunity to challenge the seating of the final replacement juror. The error could have been cured either by allowing the defense to strike into the panel or by altering the procedure so as to give the defense an opportunity to strike the last juror placed in the box by the government. In the absence of any such curative steps, we hold that the court committed the same error that we found in *Butler*.

The crucial issue, however, is whether that error is reversible. Until recently, this court had consistently held that a defendant's right of peremptory challenge, though not a constitutional right, was so fundamental that any infringement of it was reversible as a matter of law, without a showing of actual prejudice. *E.g., Wells v. United States*, 515 A.2d 1108, 1111 (D.C.1986). We reconsidered that view in light of the Supreme Court's decision in *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), which drew a distinction between "trial errors" and "structural errors" and concluded that only the latter type of errors could never be deemed harmless. In *Lyons v. United States*, 683 A.2d 1066 (D.C.1996) (en banc), we overruled *Wells* and several other cases,

and held that errors adversely affecting the exercise of peremptory challenges were not structural errors within the meaning of *Fulminante;* consequently, without a showing of actual juror bias, they were not *per se* reversible. *Id.* at 1067. Because the appellants in *Lyons* had not preserved their objection to the trial court's alleged error, we examined the record for plain error and found none. *Id.* at 1072. In this case, however, because Reid's counsel objected twice to the trial court's method of jury selection and clearly stated the grounds for her objection both times, plain error review is not available.

■ In the years since *Fulminante,* the Supreme Court has not ruled on the standard of review applicable to an error affecting the right of peremptory challenge when the defendant preserved his objection in the trial court.[10] We recognize that several federal circuits have adhered to the view that the erroneous denial or impairment of the right of peremptory challenge is reversible *per se* even after *Fulminante. See United States v. Annigoni,* 96 F.3d 1132 (9th Cir. 1996) (en banc) (holding that errors respecting peremptory challenges are "structural" and thus not amenable to harmless error review); *Kirk v. Raymark Industries, Inc.,* 61 F.3d 147 (3d Cir.1995) (denial or impairment of a statutory right of peremptory challenge is *per se* reversible error without a showing of prejudice), *cert. denied,* 516 U.S. 1145, 116 S.Ct. 1015, 134 L.Ed.2d 95 (1996); *United States v. Broussard,* 987 F.2d 215 (5th Cir.1993) (denial of the right of peremptory challenge is reversible error without a showing of prejudice), *superseded on other*

grounds by *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).[11] Nevertheless, we are bound by, and adhere to, our contrary holding in *Lyons.* Consistently with *Lyons,* we hold that because the denial or impairment of the peremptory challenge right is a "trial error" within the meaning of *Fulminante,* but not a "structural error," it is subject to harmless error review when it has been properly preserved.

■ This is not the first time we have gone down this road. In two post-*Lyons* cases, we affirmed the convictions of the respective defendants after rejecting claims that a tainted juror had sat on the jury, finding harmless error in each case. In *Young v. United States,* 694 A.2d 891 (D.C. 1997), the challenged juror had a prior armed robbery conviction and was on parole at the time of trial. When this came to light, the trial court held a hearing and found "no evidence whatsoever that this juror had any actual bias against the defendants or in favor of the government." *Id.* at 893. Young argued on appeal that this court "should presume [the juror] was biased and that Young was prejudiced *per se* as a result." *Id.* at 894. We rejected that argument and upheld the trial court's finding of no actual bias. A few months later we reached the same result in *Graham v. United States,* 703 A.2d 825 (D.C.1997). In *Graham,* after the jury had begun to deliberate, a juror suddenly recalled that he knew a key government witness (a co-defendant who had pleaded guilty and testified against Graham) as an acquaintance of his daughter. After reopening the *voir dire* and questioning the juror, the trial

---

10. Although *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), is frequently cited as stating the standard of review in such cases, a careful reading of *Ross* reveals that the defendant did not properly preserve his objection. In *Ross* the defendant exercised a peremptory challenge against an objectionable juror when the trial court erroneously refused to exclude the juror for cause. Rather than asserting that his right of peremptory challenge had been impaired, the defendant maintained that his right to an impartial jury had been infringed by the fact that he was black and the seated jury was entirely white. The Supreme Court ultimately ruled against the petitioner-defendant, holding that although his peremptory challenge rights had been impaired, such rights were "a means to achieve the end of an impartial jury," *id.* at 88, 108 S.Ct. 2273, and that the petitioner had "failed to establish that the jury was not impartial." *Id.* at 86, 108 S.Ct. 2273.

11. *Not every circuit has so held. See, e.g., Getter v. Wal–Mart Stores, Inc.,* 66 F.3d 1119 (10th Cir.1995) (when trial court erroneously denied defendant's motion to strike a juror for cause, and defendant then exercised a peremptory challenge to remove that juror, error was harmless absent a showing of actual bias on the part of the replacement juror), *cert. denied,* 516 U.S. 1146, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996).

court found that the juror was not biased and allowed him to remain on the jury. We affirmed the ensuing conviction, noting that "the record contains no facts to support a finding of actual bias." 703 A.2d at 829 (footnote omitted). *See also Gibson v. United States,* 700 A.2d 776, 778–779 (D.C.1997).[12]

■■■ *Lyons* makes clear that even if there is a violation of a defendant's right of peremptory challenge, reversal is not required absent a showing of actual juror bias. *Young* and *Graham* illustrate not only how difficult it is to meet this test, but also how Reid's showing in the instant case falls short. Reid's only claim of potential harm lies in the fact that the final replacement juror, number 885, had previously been the victim of a burglary and that his car had been stolen. Reid argues that as a result of these experiences, the juror's presence on the jury might have created a risk of prejudice against Reid. This argument, in our view, is too speculative to accept; the nexus between those crimes and the charges against Reid is so slight as to be virtually non-existent. We therefore hold that, although the trial court erred in the manner in which it conducted the *voir dire,* that error was harmless.

### III

Reid argues that the trial court committed reversible error when it instructed the jury on self-defense. Over Reid's objection, the court instructed the jury as follows:

> If you find that the defendant was the aggressor, or if he provoked the conflict upon himself, he cannot rely upon the right of self-defense to justify his use of force.

One who deliberately puts himself in a position where he has reason to believe that his presence will provoke trouble cannot claim self-defense. Mere words, without more, by the defendant, however, do not constitute aggression or provocation.[13]

Reid argues that the second sentence of this instruction is erroneous because it wrongly implies that an absolute duty to retreat is a prerequisite to a claim of self-defense. According to Reid, a claim of self-defense is defeated only if the defendant returns to his adversary with the intent to provoke violence, and then engages in behavior adequate to provoke the level of violence displayed by his adversary. That is not and has never been the law in the District of Columbia.

The text of this instruction can be traced back three-quarters of a century to the case of *Laney v. United States,* 54 App. D.C. 56, 294 F. 412 (1923). Laney was chased during a riot by a group of men who clearly intended to do him physical harm. He escaped to safety by displaying a gun and retreating to the back yard of a nearby house. Once there, while attempting to adjust the safety on the gun, Laney accidentally fired it. He then returned to the scene of the confrontation because, according to his testimony, he had to go back to work. When he reappeared in the street, he was attacked once again by the mob, which was shooting at him and threatening to kill him. Laney responded by shooting into the mob, killing one man. The Court of Appeals held that Laney had forfeited his right to claim self-defense because he had returned to the scene of the confrontation when "he had every reason to

---

12. In *Gibson* the trial court refused a request during *voir dire* for additional questioning of one of the venire members whose daughter worked for the police department. This venire member was eventually chosen as an alternate juror. During the trial, the prosecutor learned that the daughter of this juror worked in the same office as the principal government witness and promptly reported this fact to the court. The juror nevertheless was allowed to remain as an alternate, over strong defense objection; but, being an alternate, he was excused before deliberations began and did not participate in the verdict. On appeal this court "assume[d] trial court error" in refusing to allow a fuller *voir dire,* but found the error harmless even under "the most severe test for harmlessness, the constitutional standard of

*Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)," because the defendants "[could] not have suffered any degree of prejudice." 700 A.2d at 779. Under *Gibson,* the test of harmlessness remains whether the error affected the verdict—not, as Reid maintains, whether it affected "the composition of the jury."

13. This language comes from the standard "red book" instruction, Criminal Jury Instructions for the District of Columbia, No. 5.17–B (3d ed.1978), which was current at the time of appellants' trial. The instruction has been slightly amended in the most recent version of the "red book" (the 1993 fourth edition) and has been renumbered as 5.16–B, but the substance of it remains the same.

believe that his presence there would provoke trouble." *Id.* at 58, 294 F. at 414. The court held that in order to claim self-defense, a defendant

> must do everything in his power, consistent with his safety, to avoid the danger and avoid the necessity of taking life. If one has reason to believe that he will be attacked, in a manner which threatens him with bodily injury, he must avoid the attack if it is possible to do so, and the right of self-defense does not arise until he has done everything in his power to prevent its necessity.

*Id.*

On several occasions we have refused to depart from the principles set forth in *Laney.* In one recent case, for example, we affirmed a conviction when the trial court had refused to instruct the jury on self-defense because the defendant had put himself "in a position where violence was likely to result." *Howard v. United States,* 656 A.2d 1106, 1111 (D.C.1995). We held that the defendant

> had no legitimate claim to the defense of self-defense, since he had voluntarily placed himself in a position which he could reasonably expect would result in violence. Self-defense "is not available to one who finds trouble by going out of his way to look for it."

*Id.* (citations omitted). We have reached similar conclusions in other cases as well. *See, e.g., Brown v. United States,* 619 A.2d 1180, 1182 (D.C.1992) ("Appellant cannot raise a legitimate self-defense claim when he went out of his way to look for trouble"); *Mitchell v. United States,* 399 A.2d 866, 869 (D.C.1979); *Nowlin v. United States,* 382 A.2d 9, 14 n. 7 (D.C.1978). *See also, e.g., Rowe v. United States,* 125 U.S.App. D.C. 218, 219, 370 F.2d 240, 241 (1966) (quoting *Laney* ).

■ Like the two defendants in *Howard,* Reid returned to the scene of his encounter with the decedent, hoping to bring to an end the controversy between them. Then, in response to allegedly life-threatening behavior by Ward, Reid stabbed him. Case law from *Laney* to *Howard* makes clear that self-defense is not available to a defendant who deliberately puts himself in a position where he has reason to believe that his presence will provoke trouble, even if his purpose in putting himself in that position was benign. *See Howard, supra,* 656 A.2d at 1111. The supposedly objectionable sentence in the instruction given here is virtually identical to language approved by this court in *Howard, Nowlin,* and other cases. We have never held that a defendant's allegedly benevolent intentions will support a self-defense claim even though he may have placed himself in a position likely to cause trouble, and we are not inclined to do so in the circumstances presented here.[14]

## IV

■ Sams contends that the substantive charges against him were misjoined with the obstruction of justice charges against Reid. Super.Ct.Crim. R. 8(b) permits the joinder of counts in a multi-defendant prosecution if the charged offenses "are based on the same act or transaction or series of acts or transactions constituting an offense or offenses." *See Jackson v. United States,* 623 A.2d 571, 578–579 (D.C.), *cert. denied,* 510 U.S. 1030, 114 S.Ct. 649, 126 L.Ed.2d 607 (1993); *Ray v. United States,* 472 A.2d 854, 857 (D.C.1984). On the present record, we hold that Rule 8(b) was not violated.

*Bush v. United States,* 516 A.2d 186 (D.C. 1986), was a case in which two defendants, Bush and Browner, were charged with burglary, robbery, and several counts of obstruction of justice connected to those crimes. A third defendant, Tolbert, was charged with obstruction of justice and other offenses related to his attempt to conceal Bush's and Browner's identities. The trial court upheld the joinder of the charges against all three defendants even though Tolbert had not been

---

**14.** Reid cites *State v. Bristol,* 53 Wyo. 304, 84 P.2d 757 (Wyo.1938), and *Beard v. State,* 47 Tex.Crim. 50, 81 S.W. 33 (Tex.Crim.App.1904), for the proposition that he was entitled to a self-defense instruction "untrammeled by [the] provoking-the-difficulty language embodied in [Instruction] 5.16–B." We cannot follow these cases because they are contrary to seventy-five years of District of Columbia precedents, going all the way back to *Laney.*

implicated in the underlying substantive offenses involving Bush and Browner. In affirming all the convictions, we held that because Tolbert's activities were one phase of the same "series of acts or transactions constituting an offense or offenses," his attempted cover-up was logically connected to the underlying offenses and was thus a "sequel" to them. *Id.* at 191–192.

■ In the instant case, the evidence showed that Sams and Reid both participated in the attack on Ward, and that Reid's attempt to keep his girl friend from talking to the police—which was the basis for the obstruction of justice charge—was logically related to that attack. Under *Bush*, if there is such a logical connection between the two offenses, and if one is shown to be a "sequel" to the other, then joinder is proper. *See Taylor v. United States*, 603 A.2d 451, 455–456 (D.C.), *cert. denied*, 506 U.S. 852, 113 S.Ct. 155, 121 L.Ed.2d 105 (1992); *see also Jackson v. United States*, 329 A.2d 782, 787 (D.C.1974), *cert. denied*, 423 U.S. 851, 96 S.Ct. 95, 46 L.Ed.2d 74 (1975) (upholding joinder of co-defendant Schofield when indictment alleged "that Schofield assisted Jackson by threatening a material witness to the crime," even though trial court granted Schofield's motion for judgment of acquittal at the close of the government's case). Following *Bush* as dispositive precedent, we find no misjoinder.

■ Sams also made three mid-trial motions for severance, as well as a request for a mistrial which was actually another thinly disguised motion for severance. He now argues that the trial court improperly denied those motions. We review any such denials only for abuse of discretion. *Walker v. United States*, 630 A.2d 658, 663 (D.C. 1993). In order to prevail, Sams must show that "manifest prejudice" resulted from the joinder of his case with those of his co-defendants. *Elliott v. United States*, 633 A.2d 27, 34–35 (D.C.1993).

Sams argues that his charges should have been severed from those against Reid because aspects of his defense strategy were irreconcilable with Reid's and because the joint trial created "spillover" prejudice against him. The Supreme Court has held, however, that "mutually antagonistic defenses are not prejudicial *per se* " and that severance is warranted only "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Sams' claim of error does not pass this test.

■ As an initial matter, we conclude that there was no conflict between the defenses presented by Reid and by Sams. Reid's theory was one of self-defense, and Sams maintained that he was acting in defense of Reid. Reid claimed that he stabbed Ward only after Ward had pulled a knife on him, and that Sams attacked Ward only after Reid had been threatened. The case law requires a defendant seeking a severance based on his co-defendant's conflicting or hostile defense to establish a "clear and substantial contradiction" between the defenses that creates a danger or risk "that the jury will conclude guilt from the conflict alone...." · *Tillman v. United States*, 519 A.2d 166, 170 (D.C.1986). The key word here is "alone." *See Ready v. United States*, 445 A.2d 982, 987 (D.C.1982), *cert. denied*, 460 U.S. 1025, 103 S.Ct. 1279, 75 L.Ed.2d 498 (1983). If there is sufficient independent evidence of the complaining defendant's guilt, then severance need not be granted. In this case there was testimony from several government witnesses as to the activities of both Sams and Reid, so that the jury could not have been confused or misled simply by their joinder in a single indictment. Indeed, the government presented such strong evidence of Sams' guilt [15] that it would be unreason-

---

**15.** The government called two disinterested witnesses, Richard Hearne and Julia Davis, who testified that Sams and the others circled around Ward after Reid had punched him. Davis said that Sams then began beating Ward, and Hearne said that Sams hit Ward in the head once or twice with a black metal object that looked like a tire iron. Hearne also stated that when Ward dropped his knife, Sams picked it up, stabbed Ward, and then passed the knife around so that the others could do likewise. Much of this testimony was corroborated by other members of the

able to conclude that the jury chose to find him guilty solely because of any supposed conflict between his defense and that of Reid.

■ Sams argues that the failure to sever created "spillover" prejudice against him by making the trial so complex that the jury was unable to decide the guilt or innocence of each defendant separately from the others. This argument is without merit. In *Catlett v. United States*, 545 A.2d 1202 (D.C.1988), *cert. denied*, 488 U.S. 1017, 109 S.Ct. 814, 102 L.Ed.2d 803 (1989), in which nine defendants were tried together for kidnapping, armed robbery, and first-degree murder, the evidence was much more complex and difficult to sort out than in the case at bar. The jury nevertheless carefully examined the evidence and acquitted two of the defendants while finding the other seven guilty of various offenses. We upheld the denial of several defendants' motions for severance, holding that the two acquittals showed that the jury was able to assess each defendant's culpability independently. Likewise in this case, since co-defendant Clarence Blair was acquitted of all charges, we have no basis for concluding that the jury was confused or frustrated by the complexity of the evidence, or that it could not fairly decide the guilt or innocence of one defendant separately from the others.

For all of these reasons, we find no abuse of discretion in the trial court's denial of Sams' several requests for severance.

## V

The convictions of both appellants are therefore

*Affirmed.*

FARRELL, Associate Judge, concurring:

Under our recent decisions in *Young* and *Graham*, both cited by Judge Terry, appellants can obtain no relief from the claimed impairment of their right to exercise a peremptory challenge without showing that an actually biased juror was seated as a result. True, *Young* and *Graham* both differed factually from this case in that the alleged interference with peremptories arose there only mid-trial (*Graham*) or post-trial (*Young*) and in both cases resulted from a juror's wrongdoing, not—as here—the court's own putative mis-structuring of the process for peremptory challenges. But both decisions, on the strength of their reading of *Lyons v. United States*, 683 A.2d 1066 (D.C.1996) (en banc), were explicit in holding that impairment of the right to exercise a peremptory challenge does not justify reversal unless an actually biased juror was seated as a consequence. *Young*, 694 A.2d at 897 n. 7; *Graham*, 703 A.2d at 830 n. 6. Those decisions, of course, bind this division.

As an original matter, however, the issue of what showing of prejudice entitles a defendant to relief from an erroneous impairment of the right to exercise peremptories is a difficult one. There seem to be three possibilities: *per se* reversal without inquiry into prejudice (*i.e.*, prejudice presumed); reversal only if, without the impairment, the composition of the jury might have differed in any way; and reversal only upon (*i.e.*, harmless error unless there has been) a showing of actual bias. Appellants argue for the second rule, but in a great many, if not most, applications that rule will not differ from the first, since the government will be unable to show that the same twelve jurors would have sat regardless of the violation. Thus in practical terms the choice of standard for reversal is binary: "[T]he error is *always* harmless [absent a showing of actual bias, in which case the Constitution, not the right to peremptories, dictates reversal] or it is *never* harmless. There is no practical middle ground." *United States v. Annigoni*, 96 F.3d 1132, 1150 (9th Cir.1996) (en banc) (Kozinski, J., dissenting) (emphases in original).

I find it difficult to answer the reasoning of the *Annigoni* majority which led it to conclude that "the erroneous denial of a right of peremptory challenge ... is simply not amenable to harmless-error analysis." *Id.* at 1144; *see also, e.g., United States v. Underwood*, 122 F.3d 389, 392 (7th Cir.1997); *United States v. Taylor*, 92 F.3d 1313, 1325 (2d Cir.1996); *Kirk v. Raymark Industries, Inc.*, 61 F.3d 147, 162 (3d Cir.1995). But the distinct unpalatability of an automatic rever-

Sams–Reid group, including in particular Michael Brown and Tracy Lee.

sal rule for a non-constitutional violation, *see Annigoni,* 96 F.3d at 1149 (Leavy, J., dissenting), as well as the important but enigmatic bearing of *Ross v. Oklahoma* on the question, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and the split of lower-court authority, *see, e.g.,* 47 Am.Jur.2d *Jury* § 237, at 913, make this recurrent issue an attractive candidate for Supreme Court review.

Were this court to reconsider the issue en banc, I would urge that we also re-examine what constitutes a denial or impairment of "the effective exercise" of the right to peremptory challenges, *Williams v. United States,* 552 A.2d 510, 512 (D.C.1988), specifically, whether the jury selection procedure used in this case and *Butler v. United States,* 377 A.2d 54 (D.C.1977), was a deprivation of the right so as to raise the difficult issue of remedy. The court in *Underwood, supra,* while reaffirming "a broad rule of automatic reversal" for impairment of the peremptory challenge right, recognized the need to limit the operation of the rule by "narrowly defining 'denial or impairment' " of the right. 122 F.3d at 392–93 n. 3. In keeping with a line of decisions by the United States Court of Appeals for the Second Circuit, I have considerable doubt whether the trial court's particular use here of the "jury box" system for selecting the jury failed to "adequately protect[ ] [appellants'] rights." *United States v. Thompson,* 76 F.3d 442, 451 (2d Cir.1996).

The defense received and was able to use twelve peremptory challenges, two more than Rule 24 requires.[1] Also in conformity with the rule, the prosecution exercised its strikes first in each round. Only in the twelfth round, because of the trial judge's procedure of not allowing strikes into the venire and of seating a juror in the box only after each side had struck in a round, were the defendants unable to use their last strike against the replacement for the prosecutor's final strike. I agree with the implication of *Butler, supra,* that the judge's procedure was unnecessarily inflexible,[2] but the question is whether the judge abused his discretion in employing it.

The focus of this case is not on the jurors seated in the box after the challenges for cause, but on the replacements for the jurors the prosecution struck using peremptories. Unquestionably, "when the 'jury box' system is used, a litigant [must] be given some reasonable opportunity to challenge some replacements." *United States v. Blouin,* 666 F.2d 796, 799 (2d Cir.1981). Hence, a procedure that "forced [a defendant] to use all of his allotted challenges against a panel that included only half of the eventual members of his jury" would surely be an abuse of discretion. *Id.* at 799–800 (citing the court's prior reversal in *Carr v. Watts,* 597 F.2d 830 (2d Cir.1979)). Here, however, the defendants were able to use their challenges with respect to every replacement but two, the replacement for the juror last struck by the defense (about which appellants do not complain) and the replacement for the prosecution's last strike. In *United States v. Keegan,* 141 F.2d 248 (2d Cir.1944), *rev'd on other grounds,* 325 U.S. 478, 65 S.Ct. 1203, 89 L.Ed. 1745 (1945), the defendant had similarly been "obliged to exercise his last challenge before knowing the identity of two jurors— the person who replaced his last challenge and the person who replaced the Government's last challenge." *Blouin,* 666 F.2d at 799 (summarizing *Keegan* ). In *Blouin* the defendant likewise "was obliged to exercise his last challenge before knowing the identity of two members," the persons who replaced his last two challenges. *Id.* Yet in both cases the court of appeals rejected the claim that the procedure used was an abuse of discretion, the *Blouin* court holding that the procedure in that case "afforded Blouin a reasonable opportunity to challenge replacements and was well within the allowable discretion of a District Court." *Id.* at 800. *See also United States v. Thompson,* 76 F.3d at 451–52 (defendant's right to peremptories adequately protected where he "had the oppor-

---

1. Although appellants personally were allowed only three challenges each in this four-codefendant trial, Rule 24(b) expressly allocates challenges to "each side," not each defendant, the presumption being that defendants fairly joined for trial will cooperate in joint use of their peremptories.

2. I can think of no satisfactory reason for declining to allow strikes into the venire panel.

tunity to consider 11 of the 12 jurors before exercising his last peremptory challenge").

In light of these decisions, were the full court to vote to reconsider the remedy issue, I would also vote to reconsider *Butler, supra,* which the government concedes is controlling on whether the trial court's procedure here was erroneous or an abuse of discretion. In my view, an over-readiness—which *Butler* may illustrate—to find a violation of the peremptory challenge right despite the overall reasonableness of the opportunity afforded a defendant to exercise the right itself tends to discredit an automatic reversal rule and push one toward the other extreme of "always-harmless" unless actual bias is shown.